**WESTERN STATE BANK, a corporation, Plaintiff,**

**v.**

**GRUMMAN CREDIT CORPORATION, a corporation; O'Brien Flying Service, Inc., a corporation; Aero Adjustment Bureau Corp., a corporation; Spence Pitts Insurance Inc., a corporation; and Ideal Mutual Insurance Corp., a corporation, Defendants.**

**No. CV–81–77–BLG.**

United States District Court, D. Montana, Billings Division.

Nov. 26, 1982.

William G. Mouat, Billings, Mont., for plaintiff.

James L. Jones and Andrew J. Lensink, Billings, Mont., for defendant O'Brien Flying Service, and Ideal Mut. Ins. Corp.

P. Bruce Harper, Herndon, Harper & Munro, Billings, Mont., for defendant Grumman Credit Corp.

## MEMORANDUM OPINION

BATTIN, Chief Judge.

This is a secured transaction—priority case involving a dispute over the right to insurance proceeds recovered due to an airplane crash. The plaintiff, Western State Bank (Bank), and defendants Grumman Credit Corporation (Grumman), Ideal Mutual Insurance Company (Ideal), and O'Brien Flying Service (O'Brien), have all filed motions for summary judgment pursuant to Rule 56 Fed.R.Civ.P.

## FACTUAL BACKGROUND

From the stipulation of facts and the various briefs submitted to the Court, the following factual summary appears to be uncontroverted:

The present conflict arises from the crash of a Grumman Corporation aircraft—a 1977 Grumman American Ag-Cat Serial No. G164B0264, Registration No. N6753Q. The chain of title indicates the crop-duster was owned by several businesses or individuals prior to the crash. In August of 1977, Paumanock Leasing Services, Inc. (predecessor of defendant Grumman Credit Corporation), negotiated a conditional sales contract with a John Sherman, doing business as Mid-State Spraying, for purchase of the crop-duster. Sherman executed a promissory note as security. Grumman, as successor, obtained a senior perfected security interest in the plane. On September 22, 1978, Sherman then sold the plane to Gary Mills, doing business as Wy-Mont Air-Ag, a crop-dusting business. Contemporaneously with the purchase, Mills negotiated a security agreement and executed a note to finance his purchase with the plaintiff, Western Bank. Prior to this agreement, the bank had conducted a title search and determined that Grumman held a prior perfected security interest in the plane. On September 22, 1978, the Bank then properly perfected and obtained a second or junior security interest in the plane. In early May, 1979, Grumman apparently reissued its sales contract on the plane and substituted Gary Mills in place of John Sherman, as debtor. Grumman required that Mills ob-tain insurance for the crop-duster, which he did with defendant Ideal. Thus, two perfected security interests in the plane existed prior to its crash. The plane was apparently damaged a short time after insurance was procured, in May of 1979. There is no dispute as to the positions of the secured parties as of this date. However, the distribution of the insurance and salvage proceeds subsequent to the crash is the basis for plaintiff's contentions and is the subject of pending motions for summary judgment.

Subsequent to the claim, defendant Ideal issued payment to its adjuster, who ultimately transferred the draft to Reed-Shaw Stenhouse, an insurance broker for Ideal. Reed-Shaw refused to deliver the draft to Grumman until certain overdue premiums on the Mills insurance policy were paid. This demand for past-due premiums was authorized by a provision in the policy which in effect required the lienholder—Grumman—to guarantee premium payments if the insured debtor—Mills—failed to maintain coverage. Additionally, the Grumman-Mills conditional sales contract, No. 19070A, authorized Grumman to intervene and pay past-due premiums and add such additional cost to the unpaid balance—i.e., total unpaid indebtedness owed by Mills. Grumman and Ideal eventually negotiated a settlement by agreeing that: (1) Ideal would remit the $67,500 insurance draft to Grumman; and (2) Grumman would then return to Ideal $9500 in satisfaction of the unpaid premiums.

Subsequent to the insurance settlement, Grumman released its lien on the Mills airplane in August of 1979. Ideal took possession of the wreckage and, after receiving bids for the plane, ultimately sold the wreckage as salvage to defendant O'Brien Flying Service for $12,000. Ideal also agreed to indemnify O'Brien for any ownership disputes arising from this sale. There seems to be some confusion as to the history of the plane from this point forward, although it appears that O'Brien repaired and restored the plane to an operable condition.

## PLAINTIFF'S CONTENTIONS

The plaintiff Bank has asserted various claims against the defendants Grumman, Ideal, and O'Brien: (1) Plaintiff asserts that Grumman improperly substituted Mills as debtor within the conditional sales contract and that the $9500 insurance premium payment was not a future advance since such was barred by the terms of the security agreement itself; moreover, the Bank apparently maintains that Grumman did not, in essence, reperfect its security interest concerning the Mills contract, since it failed to file a new financing statement subsequent to the substitution; (2) the Bank has alleged that Grumman and Ideal converted the $9500 designated for premium payments and contends this sum was excess trust proceeds beyond satisfaction of Grumman's security interest and therefore should have been delivered to the Bank as second secured creditor; (3) the Bank also argues that it was entitled to the $12,000 salvage value paid by O'Brien to Ideal since this sum was also excess proceeds from sale of the plane and asserts that failure to remit such was also conversion; plaintiff also maintains Ideal did not possess a valid title to the plane; (4) the Bank further claims that O'Brien is liable for the $67,000 fair market value of the restored plane, since the Bank's security interest extended to all accessions under MCA §§ 30–9–314 and –315 (1979); (5) plaintiff also asserts that when a plane itself is used as collateral, priority of security interest is controlled exclusively by Federal Aviation Administration procedures regarding recordation of aircraft under 49 U.S.C. § 1403.

In summary, the Bank argues that any claim asserted subsequent to the release of defendant Grumman's security interest on August 14, 1979, is inferior to the Bank's second or junior lien. Therefore, the Bank alleges it should recover possession of the plane, all proceeds from its sale, and any improvements or attached components.

The Bank has also alleged these defendants acted in conspiracy to intentionally deprive it of its proceeds and therefore has requested an award of punitive damages.

## DEFENDANTS' CONTENTIONS

Grumman maintains that its security agreement with Mills expressly authorized the addition of future past-due insurance premiums to increase the total indebtedness to $67,500 ($58,000 plus $9500 insurance premiums). Grumman insists that its payment of the premiums relates back to the date of the first perfected security agreement and these advances take priority over the Bank's lien. Therefore, Grumman contends that this future advance provision concerning unpaid insurance premiums was notice to the Bank that Grumman's security interest might possibly increase in the future if premiums were not timely paid by Mills.

Ideal adopts Grumman's arguments concerning the $9500 past-due insurance premiums. Ideal further alleges that by delivering the insurance draft to Grumman, their insurance policy subrogation clause confers superior lien rights and substitutes Ideal in position of Grumman as senior perfected creditor with an unsatisfied security interest of $55,500 ($67,500 paid on the claim less the $12,000 obtained from sale of the plane as salvage to defendant O'Brien). Therefore, defendant Ideal contends it was subrogated to all the rights of Grumman and the Bank remains a junior lienholder until the insurance company's own expenditures are also recovered. Moreover, Ideal queries how the Bank could claim any loss when the "new" senior creditor (Ideal) remains $55,-500 "in the hole". The insurance company concludes that the $12,000 it received from sale of the wreckage was not excess proceeds which inured to the benefit of the Bank; rather, pursuant to its policy, the money recovered was correctly offset from the amount it previously paid on Grumman's claim.

Finally, Ideal argues that the facts do not support the elements of conspiracy asserted by plaintiff. In particular, Ideal maintains that disposal of the plane was not unlawful nor did plaintiff have any original or continuing rights to the plane or proceeds from its salvage unless and until Grumman, and its insured, Ideal, were fully compensated

for their losses. From the stipulated facts, it appears Ideal agreed to indemnify defendant O'Brien from claims arising from sale of the wreckage and accordingly its brief also represents the position of O'Brien.

## ISSUES

The Court believes three major issues exist in this case: (1) Applicability of the FAA recordation of ownership statute, 49 U.S.C. § 1403, to priority of liens asserted against an aircraft; (2) interpretation of the security agreement; and (3) interpretation of the insurance policy issued by Ideal.

## SECTION 1403 AND PRIORITY OF LIENS

The plaintiff contends the FAA recordation procedure under the Federal Aviation Act of 1958, 49 U.S.C. § 1403, preempts state U.C.C. Title 9 priority provisions whenever a transaction involves conveyance of title or interest in an aircraft. We disagree. Section 1403 is only a partial preemption in that its purpose is to provide a central and comprehensive recording system for registering title and security documents on such highly mobile property. *See Feldman v. Philadelphia Nat'l Bank,* 408 F.Supp. 24, 37 (E.D.Pa.1976). Thus, § 1403 serves to protect a subsequent good-faith purchaser of an encumbered aircraft from any non-registered interest holders. *CIM International v. United States,* 641 F.2d 671, 674 (9th Cir.1980). Section 1406 of the Act clearly states that priority of liens is to be governed by substantive state U.C.C. provisions.[1] Moreover, the legislative history also reveals that Congress did not preempt the states' power to consider the legal effect of a recorded document concerning this subject. *Sanders v. M.D. Sales, Inc.,* 575 F.2d 1086, 1088 n. 2 (3rd Cir.1978). *See also,* White and Summers, Uniform Commercial Code, § 25–16, p. 1077 (2d ed. 1980). Therefore, the federal statute simply provides a single repository for interested individuals to rely upon when conducting title and encumbrance investigations concerning aircraft.

## EFFECT OF THE MILLS–GRUMMAN AGREEMENT

The security agreement in this case originally listed Mid-Continent Aircraft Corporation as seller and John Sherman, doing business as Mid-State Spraying Service as buyer. Sherman executed a promissory note in favor of Paumanock Leasing Services, Inc. (predecessor of defendant Grumman Credit), to finance the purchase of the cropduster. A copy of this agreement, No. 19070, dated August 1, 1977, is attached hereto as Appendix "A". When Sherman eventually sold the plane to Gary Mills and Wy-Mont Air-Ag in September 1978, Mills assumed the obligations of Sherman's original note with Paumanock (now Grumman). Defendant Grumman stated it reissued the security agreement and substituted Gary Mills as debtor under this conditional sales contract on or about May 2, 1979. A copy of this transaction is attached hereto as Appendix "B". The Bank has asserted the "reissued" agreement has no legal effect for the following reasons: (1) It was not dated nor signed by Grumman; (2) Grumman did not have authority to substitute Mills as the new debtor under the new agreement; (3) the agreement was not filed with the FAA; (4) the Bank's own security agreement with Mills, dated September 22, 1978, and filed with the FAA is superior to the "reissued" sales contract; (5) the "reissued" contract was not negotiated for a future advance by Grumman to Mills.

The Bank apparently argues that the substitution was in effect a new contract requiring performance of all the steps of perfection previously discussed, *i.e.,* recordation with the FAA, filing a financing statement, etc. The Bank also argues that the insurance provision in the Mills-Grumman agreement could not be considered a future ad-

1. Section 1406 provides in part: "The validity of any instrument the recording of which is provided for by § 1403 of this title shall be governed by the laws of the State, District of Columbia, or territorial possession of the United States in which such instrument is delivered, irrespective of the location or the place of delivery of the property which is the subject of such instrument ...."

vance since advancements are expressly prohibited by the security agreement and under Montana's adaptation of the Uniform Commercial Code. By inference, the Bank believes the Mills-Grumman agreement somehow divested Grumman of its superior secured position in the aircraft and placed the Bank's own promissory note from Mills in the superior position.

The Bank also urges that Mills could not purchase the encumbered aircraft from Sherman and then assume the obligations of the conditional sales contract. Generically, if this were true, no individual could ever "take over payments" or "assume the note" on various personal or real property. The various courts who have confronted this situation have somewhat exacerbated the confusion which apparently exists in assessing the definition and legal implications of the substituted party to a contract. Some authorities seem to suggest that such a substitution is in fact a simple novation. See, e.g., 15 Williston on Contracts, § 1865 (3d ed. 1972); Restatement of Contracts 2d, § 280, Comment d. Other authorities have equated novation with substituted contract. See, Management, Inc. v. Mastersons, Inc., Mont., 616 P.2d 356, 359 (1980). A third segment of authorities believes that slight alterations in a contract which do not abrogate its general purpose are merely modifications of the original contract which remains enforceable as modified. See, Stinnett v. Damson Oil Corp., 648 F.2d 576, 582 (9th Cir.1980); 17A C.J.S. Contracts, § 373, p. 419. It appears that the distinctions between novation, alteration, substitution and modification are largely semantic. We believe that the facts of this case fall within the assessment expressed by these latter authorities; i.e., the substitution of Mills as sole debtor under the agreement with Grumman was merely a modification. The terms of the Mills agreement were virtually identical to those set forth in Sherman's original conditional sales contract. In this case, the definition of the assumption is largely irrelevant and would probably not merit discussion had the issue not been raised by the plaintiff. Rather, the effect of this modification governs the resolution of the remaining issues. Further, mutual assent to the substitution of debtor is evidenced by Mills' signature and by Grumman's implied consent through acceptance of payments from Mills. See 17A, C.J.S., Contracts §§ 373, 375, pp. 421–427. Therefore, we find adequate consideration existed to support the discharge of Sherman's obligations and the inception of Mills' rights and liabilities. See, Edwards v. Peavey Co., 170 Mont. 45, 549 P.2d 1082 (1976).

Plaintiff also argues that the Mills-Grumman agreement is invalid since it was not dated nor signed by a representative of Grumman, suggesting that the formal requisites of a valid contract have not been followed. The Court believes this issue may also be summarily resolved. Although some of the formal requirements of an express written contract were lacking, i.e., no signature by Grumman, the conduct of Grumman illustrates an acceptance of the contract by implication in that it intended to be bound by the agreement with Mills. See, generally, MCA § 28–2–103 (1979); 1 Williston on Contracts, §§ 22A, 23 (3d ed. 1972). It is clear that a binding conditional sales contract between Mills and Grumman existed, and that Mills was Sherman's successor in interest, assumed all obligations under the security agreement and obtained possession of the aircraft. Plaintiff has not cited a single authority which would disallow this transaction.

The Bank's next contention raises a central issue in this case—does the modification of the conditional sales contract by substitution of a new debtor require the filing of a new security agreement or financing statement with the FAA? Apparently the Bank believes that once the Mills substitution occurred in May 1979, Grumman's failure to file such change with the FAA invalidated its own security interest and the Bank's own note with Mills dated November 1978 became the senior perfected security interest. The Court must disagree once more, for several reasons.

The "notice filing" purpose of the FAA's recordation procedure is identical to state recordation under the UCC—to give *notice to potential creditors of the debtor* or to potential purchasers of the collateral, that the named secured party may have a security interest in the collateral. This notice is only the starting point for a thorough investigation and merely informs the searcher and instructs him on where to look for additional information which will be obtained after his own inquiry.

In light of the uncontroverted facts in this case, the Bank's position is particularly unpersuasive when examined in the context of notice filing. Usually, any subsequent name changes concerning the original security agreement or financing statement are important since financing statements are normally indexed according to the debtor's last name. The various authorities have split on the effect of a change in a debtor's identity dependent upon which version of the UCC § 9–402 is applied. Most of these cases discuss § 9–402 in the context of name changes, mergers, partnership reorganizations, etc., rather than actual substitution of a new debtor; however, we believe the rationale discussed is equally applicable here. The 1972 version of the Code added subsection (7) to § 9–402, which basically requires the refiling of a security agreement or financing statement upon change in a debtor's name if the change is misleading.[2] However, since this is a diversity case, we are governed by Montana's

enactment of the UCC which primarily follows the 1962 version. Unfortunately, Montana has not adopted the 1972 Code version adding subsection (7), 9–402.[3] MCA § 30–9–402 establishes the formal elements of a financing statement. Section 30–9–402(4) defines a financing statement as the original financing statement and any amendments. However, MCA § 30–9–402(5) further states that a financing statement which substantially complies with § 9–402 remains effective though containing minor errors which are not seriously misleading to searchers of the record. Authorities interpreting § 9–402(4) and (5) of the Code have agreed that the clear import of the subsections are permissive; and when read together with the durational limitations on financing statements found at § 9–403(2), there is no qualification to the continuing effect of the statement in this case. *See, e.g., Continental Oil Co. v. Citizen's Trust & Savings Bank*, 397 Mich. 203, 244 N.W.2d 243 (1976); and the Annotations collected at 99 A.L.R.3rd 1194, 1204–1224.

Unless some error or omission in the financing statement is seriously misleading, no provision within Montana's adaptation of § 9–402 alters the secured position of Grumman due to change of debtor. Moreover, it is impossible for the Bank to claim that omission of the current debtor's name by failing to amend the financing statement or file a copy of the security agreement with the FAA reflecting the change,

---

**2.** Section 9–402(7) provides "a financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired more than 4 months after the change, unless a new appropriate financing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer."

**3.** The parties have not cited any Montana authorities regarding subsequent filings due to a

change in debtor. Revision of Montana's Code to include § 9–402(7) would clarify the issue. *See, In re Taylorville Eisner Agency, Inc.*, 445 F.Supp. 665 (S.D.Ill.1977); *see also,* Comment 8 to the 1978 official UCC text which provides "Subsection (7) also deals with a different problem, namely whether a new filing is necessary where the collateral has been transferred from one debtor to another. This question has been much debated both in pre-Code law and under the Code. This article now answers the question in the negative, thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it."

created a secret lien or otherwise violated the Codes' duty of good faith established at MCA § 30–1–204 (1979). On the contrary, prior to the loan to Mills, the Bank's research disclosed that the plane involved was encumbered by Grumman's security interest. Thus, the Bank knew that its own promissor would become the new debtor under the Grumman security agreement. Good faith under the Code is defined as "honesty in fact in the conduct or transaction concerned." MCA § 30–1–201(19) (1979). There has been no evidence offered by the Bank nor can we perceive of any which would suggest that the Bank has been misled by Grumman concerning its prior perfected security interest in the plane or concerning the identity of its current debtor under the conditional sales contract. Accordingly, absent evidence that the Bank was seriously misled, no provision in Montana's version of the UCC alters the secured position of Grumman due to a change in debtor subsequent to the filing of the financing statement or security agreement with the FAA. *See, In re Hammons,* 438 F.Supp. 1143, 1155 (S.D.Miss.1977). These documents merely give an existing or prospective creditor or purchaser an avenue to discern the extent of a debtor's financial obligations so that interested persons will make informed credit decisions. It is not a guarantee that relieves a searcher of any further investigation. Here, the Bank knew the plane purchased by Mills from Sherman was already encumbered, yet it chose to loan Mills money for this purchase and allowed Mills to provide this same aircraft as partial collateral for the loan. The Bank knew that Mills, as transferee, took possession of the plane subject to Grumman's prior security interest.

The underlying purposes of the UCC are to be liberally construed to avoid contravention of the drafter's intentions. MCA § 30–1–102(1). Requiring Grumman to file the "new" security agreement or an amended financing statement with the FAA would have been a useless act since the Bank also knew of the change in debtor and therefore no deception accrued to the detriment of the Bank. Again, Montana's

adoption of § 9–402(7) would resolve the issue here. Therefore, it is clear the Bank's conduct was premised upon a thorough knowledge of the plane's previous history, which is exactly what the concept of notice filing contemplates.

The Bank also argues that because Grumman failed to record anew with the FAA, its own loan and note is superior to the "reissued" security agreement between Mills and Grumman. For the reasons previously cited, Grumman maintained its superior perfected position concerning the collateral (plane) subsequent to the change in debtor. Thus, the Bank's own security interest remained subordinate to Grumman's.

■ The Bank's final contentions relate to the insurance policy covering the plane, which was required by the terms of the Mills-Grumman security agreement. The Bank contends that the $9500 of past-due insurance premiums was an attempted future advance prohibited by the security agreement itself and by "state law". The Bank further argues that "state" law provides that a single financing statement regarding a security agreement which omits any provision for future advances, cannot form the basis for new security agreements granting such advances, thereby contemporaneously encumbering the same—i.e., original collateral. In essence, the Bank believes that without express language the security agreement here did not cover future advances secured by the same collateral. This is the much-criticized minority position discussed in *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.,* 3 UCC 1112, 1120 (R.I.Sup.Ct.1966). In *Coin-O-Matic,* the court determined that a second loan could not obtain priority from the date of filing the original financing statement where the original security agreement did not authorize future advances. *See also, Texas Kenworth Co. v. First Nat'l Bank of Bethany,* 564 P.2d 222 (Okl.1977), holding that a security agreement must expressly indicate that the collateral will be subject to a security interest arising from future advances.

The Bank also cites a portion of the Mills-Grumman security agreement, page 1, column 1, paragraph 6, which provides in part: "No other extension of credit exists, or is to be made, in connection with this purchase." The plaintiff apparently concludes this language prohibits any future advances since they would be considered "... other extensions of credit ...." The majority of courts has concluded that priority concerning future advances relates back to the initial filing, even if the security agreement contemplated only one loan. See White and Summers, Uniform Commercial Code, § 25–4, p. 1039 n. 14 (2d ed. 1980). These authorities assert that an intervening lender cannot divest the superior position of a first-filed lender who makes future advances.

Although admitting that there are no Montana cases concerning priorities of future advances in the 1962 version of the Code, Grumman maintains the security agreement authorized the inclusion of future advances for insurance premiums, and that the Court should adopt the majority opinion—i.e., MCA § 30–9–204(5) should be interpreted to include later advances made in subsequent transactions.[4]

It is true that no Montana cases exist concerning the effect of future advances in this case. Notwithstanding our own inclination to agree with the majority opinion and to apply MCA § 30–9–312(5)(a), the status of priority concerning future advances is still an open question under Montana's version of the Code.[5] Moreover, the issue of insurance proceeds can be resolved regardless of whether or not the security agreement itself authorizes future advances in the generic sense or whether future advances relating back to the original collateral are allowed in Montana. The security agreement specifically provides for the creditor's payment of past-due insurance premiums incurred by the debtor on page 1, column 2, paragraph 2, which states in part:

"In the event of failure by Buyer to procure and maintain such insurance, Seller is hereby authorized and empowered to do so and the premiums for same shall be added to the unpaid Total of Payments. The proceeds of any insurance, whether paid by reason of loss, injury, return premium or otherwise, shall be applied at the option of Seller toward replacement of the property or toward payment of the final maturing installments of Total of Payments."

Whether or not Grumman's payment of these premiums is considered a future advance, the security agreement expressly provided for their payment. The provision clearly allows Grumman to protect its position by increasing the total indebtedness due under the security agreement by the amount of overdue premiums, and this is

4. Section 9–204(5) provides: "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment."

5. The UCC 1978 Official Text, App. 2, Reasons for Change Accompanying 1972 Amendments to § 9–312, Comment 5, provides in part: "The priority of future advances against an intervening party has been the subject of much discussion and disagreement. Where both interests are filed security interests, the first to file rule of present § 9–312(5)(a) or the corresponding proposed revision is clearly applicable. Under the 1962 Code, the position of an intervening pledgee in reference to a subsequent advance by an earlier filed secured party is debatable. The proposed unified priority rule of subsection 9–312(5) would indicate that subsequent advances by the first filed party had priority and subsequent-advances under a security interest perfected by possession likewise have priority over an intervening filed security interest. These priority rules are expressly stated in proposed subsection (7)." It should be noted that the proposed subsection 7 was adopted by the 1977 amendments to § 9–312. Once again we find ourselves applying a later version of the Code which codifies the majority view allowing the relation back of future advances regardless of whether the same collateral is security for such future advances. Adoption of this subsection would clearly resolve the issue here. See generally, White and Summers, UCC, § 25–4, pp. 1039–1040 (2d ed. 1980). Additionally, with the apparent paucity of relevant authority, this question would be more appropriately resolved through certification to the Montana Supreme Court pursuant to Rule 1 of the Rules of that court. However, the Court believes that the right to the insurance proceeds here can be determined without resort to further discussion of future advances or certification.

exactly what Grumman in fact did. The Bank is in no position to deny it was aware of this provision after conducting its own research prior to the execution of its note with Mills. It is apparent that the Bank essentially desires the Court to rewrite the contract here by ignoring the insurance premium provision and treating the provision as an unauthorized future advance. We refuse to alter the express terms of this contract. *See Schulz v. Peake,* 178 Mont. 261, 583 P.2d 425 (1978). Rather, the entire agreement must be read in its entirety, with each clause assisting in interpretation of all other clauses. *Downs v. Smyk,* Mont., 604 P.2d 307 (1979). The intent of the provision is clear and unambiguous; therefore, even if the premiums were a future advance, we cannot isolate the one paragraph cited by plaintiff as stating the true intent of the agreement. Accordingly, the Court believes plaintiff was not entitled to any of the alleged $9500 excess insurance proceeds.

## IDEAL'S RIGHT TO POSSESS AND SALVAGE THE AIRPLANE

The next proceeds issue raised by plaintiff concerns the sale of the plane wreckage by defendant Ideal to defendant O'Brien. The Bank asserts that Ideal was not authorized to obtain possession of nor sell the aircraft; rather, plaintiff argues, the sale of the wreckage as salvage by Ideal was a conversion of excess proceeds which were subject to the Bank's security interest. In other words, subsequent to the satisfaction of Grumman's security interest, all proceeds realized and accessions or components attached to the plane thereafter accrued to the benefit of the Bank's security interest as a lienholder under the insurance policy. Plaintiff therefore contends that as a lienholder within the meaning of the Lienholder's Interest Endorsement in the insurance policy, its lien must be satisfied before Ideal can recoup its own losses.

Ideal derives its authority to possess and sell the plane through a provision of its insurance contract with Mills entitled "Lienholder's Interest Endorsement" which provides in part:

4. Whenever the Company shall pay the Lienholder any sum for loss or damage under this Policy and shall claim that, as to the Insured or owner, no liability therefore existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the Lienholder against the Insured or owner and in and to all the property held as security for indebtedness; or the Company may, at its option, pay the said Lienholder the whole amount due or to become due from the Insured or owner, with interest, and shall thereupon be entitled to receive a full assignment and transfer of all the rights of the said Lienholder against the Insured or owner *and of all property held as security for the indebtedness.* [Emphasis provided.]

Ideal has asserted its conduct is a typical subrogation situation whereby it has become entitled to the plane since it was considered a total loss, much like an automobile insurer is entitled to possess a "totaled" automobile subsequent to payment of a claim. Ideal also argues that the Bank lost its lien rights in the plane upon its destruction and its only remedy was a possible share in insurance proceeds received in payment for that loss. The Bank counters by alleging that subrogation occurs only when some culpable third party is responsible for the damage incurred by an insured, not when the insured himself causes the loss, as occurred here.

It is clear that the Bank would be entitled to a portion of the insurance proceeds if Grumman's lien had not exhausted the insurance fund. However, the insurance proceeds were in fact totally depleted by Grumman's lien. The Bank cannot seriously expect Ideal to, in effect, provide excess coverage beyond policy limits due to a failure by the Bank to initially secure adequate collateral for the Mills note.

In regard to the subrogation argument raised by the Bank, whatever terminology is actually applied, we believe the result urged by Ideal is correct. The possession

and subsequent sale of the plane as salvage arose from an equitable assignment, *i.e.,* the insurance company was an assignee in equity subsequent to payment of the claim as provided within Paragraph 4 of the Lienholder's Interest Endorsement of the Ideal insurance policy. Thus, Ideal was obligated to pay only the policy limits less the deductible, and after such payment was tendered, it was entitled to dispose of the plane and obtain any proceeds from its sale. If Ideal had not paid policy limits, then the Bank would be entitled to the remaining proceeds and a security interest in the wreckage. Thus, we believe Ideal performed all the duties contractually required under its insurance policy and by payment of policy limits it is not obligated to remit any additional funds beyond those limits.

## PUNITIVE DAMAGES

The plaintiff has also asked for punitive damages asserting the defendants collectively engaged in a conspiracy to deprive the Bank of the various funds previously discussed. An essential element of

any conspiracy claim is the commission of an unlawful act. *See Duffy v. Butte Teachers Union, No. 322, AFL–CIO,* 168 Mont. 246, 251, 541 P.2d 1199 (1975); *Mustang Beverage Co., Inc. v. Joseph Schlitz Brewing Co.,* 162 Mont. 243, 511 P.2d 1 (1973). We believe none of the defendants participated in any illegal acts; rather, they chose to pursue the legal and contractual remedies to which they were clearly entitled.

Based upon the foregoing discussion, there are no material issues remaining for the trier of fact to resolve. Therefore, viewing the evidence in a light most favorable to plaintiff, the Court believes summary judgment is appropriate as to all defendants and accordingly plaintiff's motion for summary judgment should be denied. *Ferguson v. Flying Tiger Line, Inc.,* 688 F.2d 1320, 1322 (9th Cir.1982) (citations omitted).

An appropriate order has previously been issued in accordance with this Memorandum Opinion.

**20**

# APPENDIX "A"

PAUMANOCK LEASING SERVICES, INC.
1111 STEWART AVENUE • BETHPAGE, N.Y. 11714
(516) 575-3421

SECURITY AGREEMENT
CONDITIONAL SALES CONTRACT

**00000055**

Date of Sale: August 1, 1977     No. 19070

Between    John Sherman

(Buyer's Name)

(Buyer's Name)

(if applicable, complete the following otherwise disregard)

(Check One)    ☐ a corporation organized and existing    ☐ a partnership formed    ☒ doing business as **Mid State Spraying Service** a trade name registered

under the laws of the State of **Kansas**, as Buyer (whether one or more than one, herein called the "Buyer").

and **Mid-Continent Aircraft Corporation, Drawer L, Hayti, MO 63851**
(Seller's Name)     (Seller's Principal Place of Business)

as Seller (herein called the "Seller").

Buyer hereby purchases from Seller, on the following terms, covenants and conditions, the goods (Collectively herein called "Collateral") listed below which Buyer has examined and accepted in their present condition:

**DESCRIPTION OF GOODS SOLD**
(List all articles and include make, year, model, serial no. and any other identifying information)

1977 Grumman American Ag-Cat
G164B, S/N 264B, N-6753Q

**STATEMENT OF SALE**

| | |
|---|---|
| Cash Sale Price ............................ $ _____ | Where labor and materials are furnished. |
| Cash Price of Materials Furnished....... $ _____ | |
| Cash Price of Labor .................... $ _____ | |

1. Total Cash Price........................ $66,800.00
2. Down Payment!
   - Cash ............ $ _____
   - Other Credits ................ $ _____
   - Trade in Allowance........ $ _____
   - Total Down Payment Credit ........ $6,680.00
3. Unpaid Balance of Cash Price........ $50,120.00
   (Subtract 2 from 1.)
4. Fees (Including Filing Fees) ........ $15.00
5. Principal Balance ................. $60,135.00
   (Add 3 and 4.)
6. Credit Service Charge (12.5 %APR) ........ $21,976.67
7. Time Balance........................ $92,111.67
   (Payable in installments) (Add 5 and 6.)

Buyer agrees to pay Seller, its successors and assigns, the aforesaid "TIME BALANCE" in ....84.... equal successive monthly installments of $ See Attachment "A" (last installment may be slightly more or less), beginning ................ ..... 19..... , and on the same date of each month thereafter, until paid Payments shall be made to PAUMANOCK LEASING SERVICES, INC. for account of the Seller or for its own account as assignee hereof, where specified

The collateral is, or will be used, primarily for the purpose checked below:

☐ personal, family or household    ☐ business
☐ farming operations;

If the collateral is, or is to become attached to real estate, a description of the real estate is as follows:

................................................................
Street Address    City    County    State

but regardless of its affixation to such real estate, the collateral shall at all times remain personal property.

In the event of any failure by Buyer to pay any installment promptly when due, Seller may, at its election, and subject to prior exercise of its right to accelerate all maturities as hereinafter provided, accept payment of all amounts in arrears, and in the event that such defaulted installment is more than ten days in arrears at the time of such payment, Buyer agrees to pay in addition to other amounts due, a Late charge not in excess of five percent (5%) of each installment or five dollars ($5.00), whichever is less Such payment shall be made as liquidated damages occasioned by the delay in making payments.

No other extension of credit exists, or is to be made, in connection with this purchase. "Buyer," wherever used herein, shall mean all persons, jointly and severally, who sign this contract as Buyers. "Seller," wherever used herein, shall include any assignee of this contract.

Title to and a security interest in the collateral described above and to and in any additions, accessions and substitutions thereto or therefor shall be and remain in Seller until payment in full cash of the Time Balance, and any other monies which may become due hereunder,

notwithstanding any re-taking and re-delivery to Buyer or the acceptance or negotiation of notes or granting of any renewals or extensions Buyer shall not encumber, assign, sell, transfer or otherwise dispose of this contract or any interest therein or in the collateral, without the written consent of the holder of this contract.

Buyer shall procure and maintain such insurance and in such amounts and form as Seller may require, the loss under all such insurance to be payable to Seller and Buyer as their interests may appear The insurance policies shall be delivered by Buyer to Seller and shall be held by Seller until this contract is fully performed, Buyer hereby assigns to Seller all moneys, not in excess of any money's due hereunder, which may become payable under such insurance including return and unearned premiums, and directs any insurer to make payment direct to Seller, and appoints Seller as attorney-in-fact to indorse any draft, make any claim under such insurance, execute any proof of claim and to cancel such insurance upon any default by Buyer. In the event of failure by Buyer to procure and maintain such insurance Seller is hereby authorized and empowered to do so and the premiums paid for same shall be added to the unpaid Time Balance The proceeds of any insurance, whether paid by reason of loss, injury, return premium or otherwise, shall be applied at the option of Seller toward replacement of the property or toward payment of the final maturing installments of the Time Balance.

Buyer hereby acknowledges notice of the intended assignment of this contract and that the intended assignee will rely upon the agreements contained in this contract, and agrees that the liability of Buyer to any assignee shall be immediate and absolute and not affected by any default or obligation whatsoever of Seller signing this contract, and, in order to induce assignee to purchase this contract, Buyer further agrees not to set up any claim against Seller as a defense, counterclaim or offset to any action by any assignee for the Time Balance or for possession of the collateral, or upon any accompanying note brought by any assignee.

Buyer acknowledges receipt of a completely filled in copy of this contract signed by the Seller.

This contract is subject to the additional terms, covenants and conditions contained on the reverse side, hereof all of which are hereby made part hereof.

IN WITNESS WHEREOF, Buyer has executed this Contract, or has caused these presents to be executed and delivered by its proper corporate officer or officers in quintuplicate as of the date first above written.

## SECURITY AGREEMENT
## CONDITIONAL SALES CONTRACT

**BUYER:**

x _John W Sherman_
Individual Signature

Individual Signature

Mid-State Spraying Service
City Township or Place Name

By _John J Sherman_
John Sherman, owner
Title

By _____ Title

Accepted: Mid-Continent Aircraft Corporation
Seller

By _Richard Reade_ Richard Reade, President
Official Title

_Residence_

3'rd & Santa Fe, Marion KS
Chief Business Address

Other Business Address (if any)

FILING COPY

# APPENDIX "B"

## GRUMMAN CREDIT CORPORATION
1111 STEWART AVENUE    BETHPAGE, NEW YORK 11714
516/575-3421

'SECURITY AGREEMENT
CONDITIONAL SALES CONTRACT

Date of Sale _____, 19_____    No __19090A__

Between    Wy-Mont Air Ag, Inc.
(Buyer's Name)

Box 921, Billings, Montana    59102
(Buyer's Name)

(if applicable, complete the following; otherwise disregard)

(Check One)    [x] a corporation organized and existing    [ ] a partnership formed    [ ] doing business as
a trade name registered

under the laws of the State of __Montana__, as Buyer (whether one or more than one, herein called the "Buyer"),

and    Grumman Credit Corporation, 1111 Stewart Avenue, Bethpage, New York 11714
(Seller's Name)    (Seller's Principal Place of Business)

as Seller (herein called the "Seller")

Buyer hereby purchases from Seller, on the following terms, covenants and conditions, the goods (Collectively herein called "Collateral") listed below which Buyer has examined and accepted in their present condition:

### DESCRIPTION OF GOODS SOLD
(List all articles and include make, year, model, serial no. and any other identifying information)

1977 Grumman American Ag-Cat

G16480264, N6753Q

### STATEMENT OF SALE

| | | |
|---|---|---|
| 1. Cash Price | | $ 66,800.00 |
| 2. Less Cash Down Payment | $ 6,680.00 | |
| 3. Trade-in | $_____ | |
| 4. Total Down Payment | $_____ | $ 6,680.00 |
| 5. Unpaid Balance of Cash Price | | $ 60,120.00 |
| 6. Other Charges (Including Filing Fees) | $ 15.00 | |
| 7. Amount Financed | | $ 60,135.00 |
| 8. Finance Charge | | $ 31,976.67 |
| 9. Total of Payments | | $ 92,111.67 |
| 10. Deferred Payment Price (1+6+8) | | $ 98,791.67 |
| 11. Annual Percentage Rate | | 12.5 % |

Buyer agrees to pay Seller, its successors and assigns, the aforesaid "TOTAL OF PAYMENTS" in 84 equal successive monthly installments of $ SEE ATTACHMENT "A" each (last installment may be slightly more or less), beginning September 1, 19 77, and on the same date of each month thereafter, until paid. Payments shall be made to GRUMMAN CREDIT CORPORATION for account of the Seller or for its own account as assignee hereof, where specified.

The collateral is, or will be used, primarily for business, commercial or agricultural purposes and will not be used primarily for personal family or household purposes unless specifically stated below.

If the collateral is, or is to become attached to real estate, a description of the real estate is as follows:

Street Address ............ City ........ County ........ State

but regardless of its affixation to such real estate, the collateral shall at all times remain personal property.

In the event of any failure by the Buyer to pay an installment promptly when due, Seller may, at its election, and subject to prior exercise of its right to accelerate all maturities as hereinafter provided, accept payment of all amounts in arrears; and in the event that such defaulted installment is more than ten days in arrears at the time of such payment, Buyer agrees to pay in addition to other amounts due, a late charge not in excess of five percent (5%) of each installment or five dollars ($5.00), whichever is less. Such payment shall be made as liquidated damages occasioned by the delay in making payments.

No other extension of credit exists, or is to be made, in connection with this purchase. "Buyer," wherever used herein, shall mean all persons, jointly and severally, who sign this contract as Buyers. "Seller," wherever used herein, shall include any assignee of this contract provided however that no assignee shall be deemed to have made any warranty whatsoever whether express or implied with respect to the collateral.

Title to and a security interest in the collateral described above and to and in any additions, accessions and substitutions thereto or therefor shall be and remain in Seller until payment in full cash of the Total of Payments, and any other monies which may become due hereunder not withstanding any re-taking and re-delivery to Buyer or the acceptance or negotiation of notes or granting of any renewals or extensions. Buyer shall not encumber, assign, sell, transfer or otherwise dispose of this contract or any interest therein or in the collateral, without the written consent of the holder of this contract.

Buyer shall procure and maintain such insurance and in such amounts and form as Seller may require, the loss under all such insurance to be payable to Seller and Buyer as their interest may appear. The insurance policies shall be delivered by Buyer to Seller and shall be held by Seller until this contract is fully performed. Buyer hereby assigns to Seller all moneys, not in excess of any moneys due hereunder, which may become payable under such insurance including return and unearned premiums, and directs any insurer to make payment direct to Seller, and appoints Seller as attorney-in-fact to indorse any draft, make any claim under such insurance, execute any proof of claim and to cancel such insurance upon any default by Buyer. In the event of failure by Buyer to procure and maintain such insurance Seller is hereby authorized and empowered to do so and the premiums paid for same shall be added to the unpaid Total of Payments. The proceeds of any insurance, whether paid by reason of loss, injury, return premium or otherwise, shall be applied at the option of Seller toward replacement of the property or toward payment of the final maturing installments of the Total of Payments.

Buyer hereby acknowledges notice of the intended assignment of this contract and that the intended assignee will rely upon the agreements contained in this contract, and agrees that the liability of Buyer to any assignee shall be immediate and absolute and not affected by any default or obligation whatsoever of Seller signing this contract; and, in order to induce assignees to purchase this contract, Buyer further agrees not to set up any claim against such Seller as a defense, counterclaim or offset to any action by any assignee for the Total of Payments or for possession of the collateral, or upon any accompanying note brought by any assignee.

Buyer acknowledges receipt of a completely filled in copy of this contract signed by the Seller.

This contract is subject to the additional terms, covenants and conditions contained on the reverse side hereof all of which are hereby made part hereof.

IN WITNESS WHEREOF, Buyer has executed this Contract, or has caused these presents to be executed and delivered by its proper corporate officer or officers in quintuplicate as of the date first above written.

## SECURITY AGREEMENT
## CONDITIONAL SALES CONTRACT

BUYER: _____
Individual Signature

_____
Individual Signature

Wy-Mont Air Ag, Inc.
Corp /Partnership/Trade Name

By _____
Gary Mills, President    Title

By _____

Residence _____

Residence
Box 921, Billings, Montana    59102
Chief Business Address

Other Business Address (if any)

Accepted    Grumman Credit Corporation
Seller    Raymond G. Nightingale, President

By _____
Official Title

ORIGINAL

## Appendix "B"—Continued

### ADDITIONAL TERMS, COVENANTS AND CONDITIONS FORMING PART OF THE CONDITIONAL SALES CONTRACT ON THE REVERSE SIDE HEREOF.

1. Risk of loss of, injury to, or destruction of the collateral shall be at all times in Buyer. The loss of, injury to, or destruction of the collateral shall not release, abate or impair Buyer's obligations hereunder. Buyer will pay promptly all taxes and assessments upon the collateral and/or for its use or operation and/or on this contract. Buyer will keep the collateral free from mortgages, liens and other encumbrances. Seller shall have the right of correct patent errors herein, or in any other document given in connection herewith. Any notices to Buyer shall be sufficiently given if mailed to Buyer's address appearing on the reverse side hereof. Buyer shall not allow the use of the collateral in connection with any undertaking prohibited by law; shall keep the collateral in first-class order, repair and running condition; and shall preserve the same from all injury and damage, ordinary wear and tear excepted.

2. Buyer represents and warrants that the property traded in, if any, is free from mortgages, liens and other encumbrances.

3. If Buyer shall fail to make any of the payments herein provided for, or shall fail to perform or observe any of the terms or conditions hereof, in the manner and, within the time specified therefor, or if any representation or warranty made by Buyer herein or in any statement given to Seller shall be materially untrue, or if Buyer shall abandon the collateral, or if Buyer fails to procure and maintain the insurance required by Seller or to deliver the insurance policies to Seller, or if Buyer or any guarantor hereunder shall die or (being a partnership or corporation) shall be dissolved, or shall become insolvent (however evidenced), or upon the suspension of the business of the Buyer, or upon the issuance or filling of any order of attachment, lien, lis pendens or the institution of foreclosure proceedings with respect to any property of the Buyer or the real property described herein, or a mortgaging or conveyance thereof, or if Buyer's lease of the premises where the collateral is located is cancelled or otherwise terminated, or upon the commencement of any proceeding under Article 52 of the New York Civil Practice Law and Rules against the Buyer or any of the property of the Buyer, or upon the making by the Buyer, or any guarantor hereof, of an assignment for the benefit of creditors, or upon a trustee or receiver being appointed for the Buyer or any guarantor hereof, or for any property thereof, or upon Buyer's making or sending notice of an intended bulk sale, or upon any proceedings being commenced by or against the Buyer or guarantor hereof under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt,

receivership, liquidation or dissolution law or statute, or upon entry of any judgment against Buyer, then and in any such event, (a) the entire balance of the Time Balance shall, at the option of Seller, become immediately due and payable without notice or demand, together with an attorney's fee of 15% of the amount then owing if placed with an attorney for collection or other legal action is taken; (b) Seller shall have the rights and remedies of a secured party under the Uniform Commercial Code and, in addition, the rights and remedies provided herein; and (c) Seller shall have the right to retake the collateral wherever located, hold and dispose of same and collect expenses of retaking, storage and sale and any deficiency from Buyer. Buyer shall execute and deliver to seller such papers and shall do all such acts and things as Seller may at any time and from time to time reasonably request or as may be necessary or appropriate to create and maintain a perfected security interest in the collateral as security for Buyer's obligations hereunder, free from any prior security interests, mortgages, lien or other encumbrances. Seller is hereby authorized to prepare and file any and all Financing Statements applicable hereto as Seller may deem necessary without the signature of Buyer. Buyer will pay all fees for the filing of, any, applicable Financing Statement(s) or of this contract or any evidence of the assignment thereof or for satisfying this contract and, if not prohibited by law, for prior lien searches whenever and wherever such searches are, in the sole determination of Seller, deemed necessary.

4. Seller shall have the right to enforce one or more remedies hereunder successively or concurrently and such action shall not operate to estop or prevent Seller from pursuing any further remedy which Seller may have hereunder. Any action by Seller to enforce payment shall not waive or affect any of Seller's rights hereunder and no indulgence granted Buyer by Seller shall be considered a waiver of any rights of Seller. No promises, agreements, representations or warranties shall be binding upon Seller, unless same shall have been made a part of this contract in writing. This contract shall apply to and inure to the benefit of and bind the heirs, executors, administrators, successors and assigns of both parties hereto. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision of this contract. Buyer expressly waives all exemptions. Buyer does also hereby waive the right of a jury trial in any action or proceeding brought in any court by either party or assigns arising out of subject matter of this contract, the collateral, or any note or other obligation secured thereby. This contract is a New York contract and cannot be changed orally.

### ASSIGNMENT

FOR VALUABLE CONSIDERATION, receipt whereof is hereby acknowledged, the undersigned hereby sells, assigns, transfers and sets over unto GRUMMAN CREDIT CORPORATION, its successors and assigns, the contract appearing on the face and reverse sides hereof, and all right, title and interest of the undersigned in and to the collateral therein described, hereby granting full power to the assignee, either in its own name or in the name of the undersigned to take all such legal or other proceedings as the undersigned might have taken but for this assignment. The undersigned hereby represents and warrants that said contract is valid and genuine in all respects and enforceable in accordance with its terms, that there is no defense, counterclaim or offset against said indebtedness that the signatures appearing on the contract are genuine, that the statements of fact in said contract are true, that the collateral described in said contract is free and clear of all other security interests, liens and encumbrances and has been sold and delivered by the undersigned, that the description of said collateral is true and complete, that the undersigned has not granted, and will not grant to anyone other than GRUMMAN CREDIT CORPORATION any security interest in said contact or in the property therein described, that no Financing Statement or other instrument affecting said contract or collateral or any rights therein, in which the undersigned is named as a debtor, is on file in any public office, and that the down payment mentioned in said contract was in cash and not in its equivalent except as expressly provided in the contract. The undersigned agrees that notwithstanding this assignment, it will indemnify and hold assignee harmless against any claim by buyer arising out of the sale or delivery of the collateral. The undersigned hereby appoints GRUMMAN CREDIT CORPORATION or any of its officers or agents, attorney-in-fact of the undersigned to execute any necessary satisfaction of the contract or termination statement. This assignment is made subject to the agreements, if any, between the assignee and the undersigned and to any modification or replacements thereof.

Dated: _____  ~~Grumman Credit Corporation~~ _____ Seller

By _____

Official Title: ~~Raymond G. Nightingale, President~~

### GUARANTY OF PAYMENT

In consideration of the sale by Seller to Buyer(s) of the collateral described in the contract appearing on the face and reverse sides hereof on the terms therein set forth, the undersigned hereby irrevocably and unconditionally guaranty(s) to Seller and/or its assigns payment in full when due, whether by acceleration or otherwise, of the Total of Payments together with all interest, late charges, attorney's fees and any and all other sums advanced by Seller or its assigns on account of said contract or the collateral sold thereunder which are chargeable to the Buyer(s) and/or any deficiency balance remaining thereon after any repossession and sale of the said collateral either by or through Seller or its assigns without regard to either how or when accomplished. As used herein, the terms "Buyer," "Seller" and "Total of Payments" shall have the respective meanings assigned to them in said contract.

This Guaranty shall be governed by and construed in accordance with the law of the State of New York and shall be binding upon the executors, administrators and personal representatives of the undersigned, and if the undersigned, or any of them, is a corporation, upon its successors and assigns. The undersigned hereby waive(s) notice of acceptance of this Guaranty or of any action taken or omitted in reliance hereon. The undersigned agree(s) that the liability of Buyer(s) may be modified, extended, waived or released and that said collateral and/or title thereto may be dealt with in any manner by anyone and/or that any of the provisions of said contract may be amended or modified; all without affecting the liability of the undersigned hereunder. If this Guaranty is signed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used in this Guaranty shall mean the parties who have signed this Guaranty and each of them.

IN WITNESS WHEREOF, the undersigned has (have) executed this Guaranty in quintuplicate and hereby acknowledge(s) receipt of one copy thereof, on the _____ day of _____, 19___.

(Guarantor) _____ (Address) _____

Gary Mills

(Guarantor) _____ (Address) _____

Witness _____

(Type or print name of each Guarantor below line)