This case began as a lawsuit to resolve a dispute over the proceeds of the 1983 corn and soybean crops of Edward Garris, a farmer indebted to both Appellant Dixie Ag and Appellee Nelson.
In 1982 Garris incurred a debt of $120,000.00 to Dixie Ag for farm equipment, supplies, and cash advances, such indebtedness being evidenced by a promissory note. By May of 1983, Garris had reduced the debt to $91,809.39.
Garris, in need of credit for his 1983 farming operation, executed a security agreement and financing statement on July 16, 1983, securing his indebtedness to Dixie Ag. The security agreement referenced Garris's previous debt "evidenced by a *Page 1038 
promissory note or notes," and the financing statement reflected an initial debt of $57,000. The July 16, 1983, security agreement provided, in part:
 "WHEREAS, the Debtor is indebted to the Secured Party which indebtedness is evidenced by a promissory note or notes from the Debtor to the Secured Party; and
". . .
 "WHEREAS, the parties have agreed that all debts due this Secured Party by the Debtor shall be secured in accordance with the terms of this agreement;
". . .
 "NOW, THEREFORE, for and in consideration of the premises and the agreements made herein, the parties agree as follows:
". . .
 "This security interest is given to secure performance and the payment of any and all indebtedness and liabilities whatsoever of Debtor to Secured Party whether direct or indirect, absolute or contingent, due or to become due, and whether now existing or hereafter arising, and however evidenced or acquired, and whether several, joint, or joint and several."
The security agreement and financing statement were filed in the Probate Courts of Washington and Clarke Counties (the counties where the crops were being grown and the county where Garris was a resident) on July 18, 1983. Also on July 18, 1983, by a procedure known in the grain industry as "booking," Garris contracted with Nelson to sell Nelson 8,500 bushels of corn and 10,000 bushels of soybeans from Garris's 1983 crop. Nelson, through her brokerage business, contracted to sell the Garris crop to two other companies.
On July 25, 1983, Garris, his wife, his brother, and his brother's wife purportedly executed a revised security agreement which specifically covered both the 1982 and the 1983 Garris debts and which again gave Dixie Ag a security interest in Garris's 1983 crop and the proceeds therefrom, but which also deferred the time for repayment of Garris's 1982 debts to Dixie Ag. This document reflected a secured indebtedness of $149,000.00, and made specific reference to the 1982 past-due debt. Dixie Ag extended Garris $85,260.94 credit in 1983.
On August 25, 1983, Dixie Ag wrote Nelson and informed her of Dixie Ag's security interest in Garris's 1983 crops. On August 26, 1983, Nelson received a letter from Dixie Ag requesting (as was the custom in the grain business) that Nelson disburse funds on the sale of Garris's crops jointly to Garris and Dixie Ag.
On September 6, 1983, Nelson withheld $9,137.76 of Garris's corn crop proceeds in payment of the amount by which Garris was "short" in the corn he delivered and in payment of previously existing debts owed Nelson by Garris. On November 7, 1983, Dixie Ag's lawyer wrote to Nelson advising her again of Dixie Ag's security interest and informing her that her withholding proceeds was in violation of Dixie Ag's security interest. During the period of December 30, 1983, to February 24, 1984, however, Nelson also withheld $13,411.95 of the proceeds of Garris's soybean crop in payment of the amount by which Garris was "short" in the soybeans he delivered and in payment of previously existing debts owed Nelson by Garris.
Dixie Ag sued Nelson, alleging that Nelson had converted the proceeds of Garris's 1983 crops. Dixie Ag amended its complaint to allege that Nelson had wrongfully withheld, rather than converted, the proceeds of Garris's crops in violation of Dixie Ag's security interest. At the close of all the evidence, the trial court denied Dixie Ag's motion for a directed verdict and submitted the case to the jury on Dixie Ag's amended complaint.
Judgment was entered on a jury verdict in favor of Nelson, and Dixie Ag's post-judgment motion for JNOV/new trial was denied. We reverse and remand.
On appeal, Dixie Ag concedes that the jury's verdict as to the invalidity of the July 25, 1983, security agreement was *Page 1039 
based on permissible inferences from all the evidence and upon the law as outlined in a correct jury charge.[1] As to the July 16, 1983, security agreement, however, Dixie Ag presents alternative arguments in support of its plea for reversal of the judgment below:
1. Nelson, despite actual notice of Dixie Ag's security agreement with Garris, withheld funds from the proceeds of Garris's 1983 crops in satisfaction of an unsecured debt and in derogation of a prior, valid security interest giving Dixie Ag the right to Garris's crops and all the proceeds therefrom. The July 16 security agreement was unambiguous and properly executed and filed, and the trial court was bound to enforce the terms of that security agreement as written. Kinnon v.Universal Underwriters Insurance Co., 418 So.2d 887 (Ala. 1982). Dixie Ag contends, therefore, that it was entitled to a directed verdict (§ 7-9-201, Code 1975), and that the trial court erred in refusing to enforce the security agreement as written; and
2. If, however, the terms of the July 16 security agreement were ambiguous, it was within the province of the jury to ascertain the truth of the evidence, to draw reasonable inferences therefrom, and, upon proper instructions from the trial court, to interpret the allegedly ambiguous document in light of the facts established by the evidence. Huggins v.Hanover Insurance Co., 423 So.2d 147 (Ala. 1982). The trial court erred in interpreting and reforming the security agreement and charging the jury that the July 16 document secured only the $85,260.94 credit Dixie Ag extended to Garris during 1983. By his charge, the trial judge removed from the jury's consideration the issues of both the basic validity of the July 16 security agreement and the extent of the debts secured by it:
 "THE COURT: Okay, as I was saying, as to the July 16th security agreement, if any portion of the $85,000 that was covered by that security agreement was still outstanding on August 18th, 1984, when this lawsuit was filed, then that security agreement would have been in effect and would have covered this crop and/or the proceeds of this crop. . . .
 "If you find, on the other hand, that the money paid by or for the benefit of Garris between July the 16th, 1983, and August 28th, 1984, should have been applied first to the advances of $85,000 and then to the indebtedness of $91,000, then based on the stipulation that there was $135,000 paid, you may find that the security agreement of July 16th was no longer in effect since it covered only the future advances of $85,000. In that event, if this security interest, security agreement of July 16th was no longer in effect, you must — you cannot find under the July 16th security agreement." (Emphasis supplied.)
Dixie Ag also claims error in the trial court's instructions to the jury as to the appropriate measure of damages. The trial court refused to instruct the jury that Dixie Ag, if it prevailed at trial, would be entitled to the entire amount withheld by Nelson in satisfaction of Garris's debts to Nelson and in payment for the shortages in Garris's promised crop deliveries. The trial court stated, as the basis of its refusal, that, under the Alabama version of the Uniform Commercial Code and the custom and usage of the grain industry, "proceeds" did not include amounts required by the buyer to purchase grain to make up shortages in previously booked deliveries.
We agree with Dixie Ag that Nelson wrongfully withheld funds from the proceeds of Garris's 1983 crops in violation of Dixie Ag's valid security interest in those proceeds by virtue of the unambiguous and fully valid security agreement executed on July 16, 1983, and filed on July 18, 1983.
Initially, we look to the security agreement itself. As the express language of the disputed provisions set out above reflects the security agreement specifically *Page 1040 
referenced both the prior indebtedness of Garris to Dixie Agand the promissory note which evidenced that debt. By signing the security agreement, Garris and Dixie Ag agreed, in clear and unambiguous terms, that all debts were secured thereby.
Nelson's argument on this issue focuses on the validity of the "dragnet" clause, which provides that the security agreement gives an interest to Dixie Ag
 "to secure performance and the payment of any and all indebtedness and liabilities whatsoever of Debtor to Secured Party . . . due or to become due, and whether now existing or hereafter arising, and however evidenced or acquired. . . ."
Such clauses, says Nelson, are disfavored in Alabama law and must be explicit as to other debts where there is an intention to include those debts by reference in a newly executed security agreement; and here, urges Nelson, the security agreement refers to no specific amount of existing debt.
It is the law in Alabama, however, that a dragnet clause which, although not itemizing the existing indebtedness, does, by clear and unequivocal terms, reference and include a specific and identifiable antecedent debt, extends the coverage of the security agreement to that antecedent debt. The dragnet clause, therefore, may be given the full effect of its terms. See Underwood v. Jarvis, 358 So.2d 731 (Ala. 1978); CityNational Bank of Dothan v. First National Bank of Dothan,285 Ala. 340, 232 So.2d 342 (1970); First National Bank ofGuntersville v. Bain, 237 Ala. 580, 188 So. 64 (1939).
In keeping with the common practice of consolidating various debts of one debtor to one creditor, Garris and Dixie Ag executed the July 16, 1983, security agreement containing a dragnet clause which accomplished such consolidation as between these two parties. The failure to describe the existing indebtedness with more specificity as to date and amount of past due balance does not create an ambiguity, because the security agreement refers to a specific existing promissory note. Therefore, the more general reference to the existing Garris/Dixie Ag promissory note and existing debt was sufficient. When the language of the dragnet clause is taken into consideration with the language of the security agreement, there can be no question as to the indebtedness covered by the July 16, 1983, security agreement.
Nelson advances several arguments in support of the judgment entered below.
First, says Nelson, Dixie Ag implicitly authorized the sale of Garris's 1983 crops by Nelson when Dixie Ag participated in the booking process and when it wrote to Nelson requesting joint disbursement of the proceeds to Garris and Dixie Ag. Therefore, argues Nelson, upon authorizing the sale, Dixie Ag lost its security interest in Garris's crop under the provisions of § 7-9-306(2). We do not agree.
Section 7-9-306(2) provides:
 "Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."
This section, and the official comments which follow both § 7-9-306 and § 7-9-307, make it clear that a creditor does not forfeit his security interest in the proceeds of the collateral upon sale of the collateral to a third party, even when the sale is made with the authorization of the secured party. For a succinct interpretation of the UCC's approach to the secured party's retention of its interest in the proceeds after sale of the collateral, see In re Mid State Wood Products Co.,323 F. Supp. 853, 857 (N.D.Ill. 1971).
Nelson claims that at trial Garris "flatly stated" that, when he signed the July 16, 1983, security agreement, he had no intention of securing his 1982 debt to Dixie Ag; therefore, because there was no "meeting of the minds" between Garris and Dixie Ag, Nelson says, it was not a valid security agreement. We point out *Page 1041 
that the unambiguous terms of the security agreement do not allow the consideration of parol evidence which would alter or negate its express terms. See Gunnels v. Jimmerson,331 So.2d 247 (Ala. 1976). It should also be noted, however, that Nelson's argument on this point would fail even if the security agreement were ambiguous. In the case of Lilley v. Gonzales,417 So.2d 161 (Ala. 1982), the Court quoted extensively from Professor Corbin's treatise on contract law on the issue of mutual assent in support and in explanation of its holding that "the law of contracts is premised upon an objective rather than a subjective manifestation of intent approach." Lilley v.Gonzales, 417 So.2d at 163.
 "Professor Corbin, in his treatise on contract law, speaks to the issue of mutual assent as follows:
 " 'Agreement consists of mutual expressions; it does not consist of harmonious intentions or states of mind. . . . At present, however, what we observe for judicial purposes is the conduct of the parties. We observe this conduct and we describe it as the expression of a state of mind. It is by the conduct of two parties, by their bodily manifestations, that we must determine the existence of what is called agreement. That is what is meant by the anciently honored term "meeting of the minds." That is what is meant by mutual assent.
 " '[One] may be "bound" by a contract in ways that he did not intend, foresee, or understand. The juristic effect (the resulting legal relations) of a man's expressions in word or act may be very different from what he supposed it would be. . . . [B]ut it is of much greater importance to realize that the courts must determine the requirements of justice and that the legal effects thus given to expressions of agreement are seldom exactly what one or both of the agreeing parties supposed or expected.' A. Corbin, Corbin on Contracts § 9 (1952)." Lilley v. Gonzales, id.
Therefore, Garris can not now, in the face of a properly executed and unambiguous security agreement, claim that his intention was that the security agreement secure a different debt than the one plainly set out and agreed upon in the terms of the July 16, 1983, security agreement. To allow Garris's testimony as to his subjective intent when signing an otherwise unambiguous security agreement would be "a classic violation of the parol evidence rule." Kimbell Foods, Inc. v. RepublicNational Bank, 557 F.2d 491 (5th Cir. 1977), aff'd sub nom.United States v. Kimbell Foods, Inc., 440 U.S. 715,99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).
Finally, Nelson argues that, according to the holding inIn re Metzler, 405 F. Supp. 622 (N.D.Ala. 1975), the trial court may look to the financing statement filed with the security agreement to aid the court in construing the security agreement. Here, says Nelson, the financing statement filed with the July 16, 1983, security agreement specified an amount of $57,000, which was representative of the estimated funds needed by Garris in 1983; therefore, she says, the trial court was correct in construing the security agreement as securing only those debts which Garris actually incurred in 1983. We find, however, that in Metzler the contract in question had been found to be ambiguous, thus necessitating the court's construction of the document's terms. No ambiguity exists here, and there is no need to look outside the provisions of the security agreement itself. It is interesting, too, that the Tenth Circuit Court of Appeals has held that the financing statement is not a security agreement and is not an instrument to create or alter a security agreement. Mitchell v. ShepherdMall State Bank, 458 F.2d 700 (10th Cir. 1972).
Having resolved Dixie Ag's primary argument in its favor, we need not address its alternative position.
We turn, then, to Dixie Ag's final issue concerning the appropriate jury instruction on the measure of recovery for Dixie Ag, if any. We agree with Dixie Ag *Page 1042 
that the trial court was in error in finding that the amounts withheld by Nelson to make up for Garris's shortages in his promised grain deliveries were monies outside the definition of "proceeds" and, as such, were not wrongfully withheld by Nelson.
The July 16, 1983, security agreement specifically provided that Dixie Ag's security interest extended to the proceeds of Garris's crops. By the unambiguous language of that security agreement, Dixie Ag was entitled to the full proceeds of Garris's crops, and not to an amount reduced by Nelson's contract shortages.
This does not mean that Dixie Ag is entitled to more than thenet proceeds of the sale of Garris's crops. Dixie Ag may recover the proceeds of the sale of Garris's crops less an amount which represents the usual "incidents" of the marketing and sale of grain (e.g., marketing expenses, brokerage fees, commissions, etc.). But Dixie Ag's recovery may not be reduced by an amount which would make up for the shortfall in Nelson's brokerage contracts. The resale of the grain produced by Garris's 1983 crop was the subject of contracts between Nelson and third parties. We can not now allow Nelson to make Dixie Ag responsible for the risks and losses of Nelson's brokerage business.
We hold, therefore, that the trial court erred in not directing a verdict for Dixie Ag in the amount of the net proceeds from Nelson's sale of Garris's 1983 crop. The judgment appealed from is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and SHORES, ADAMS and STEAGALL, JJ., concur.
[1] Garris denied executing the July 25, 1983, document and the issue of its validity was submitted to the jury.