FIRST NATIONAL BANK, CORTEZ, COLORADO, a United States Banking Corporation, Appellant (Plaintiff)

v.

FIRST INTERSTATE BANK, RIVERTON, N.A., Wyoming, a United States Banking Corporation, Appellee (Defendant).

No. 86–283.

Supreme Court of Wyoming.

June 16, 1988.

Rehearing Granted Aug. 18, 1988.

Donald P. White of White & White, P.C., Riverton, Robert Duitch and Dean T. Ogawa of Duitch & Johnson, P.C., Colorado Springs, for appellant.

Joel M. Vincent of Hettinger, Leedy and Vincent, P.C., Riverton, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

This appeal presents a UCC and FAA airplane security-interest-priority conflict between two lenders, and raises a question of the validity of antecedent-debt inclusion in document clauses variously labeled dragnet or anaconda. We reverse the trial court's finding that the first recorded security interest should be accorded priority.

██ The rule here established is that an anaconda or dragnet clause, as a matter of notice to subsequent parties in interest or claimants to the encumbered asset, is valid in the absence of actual knowledge only if the additionally included existent indebtedness is expressly described in the security instrument which constitutes the filed notice. Under security-document notice requirements, any subsequent party claiming an interest should have constructive or actual notice of the *secured total claimed* to lose priority to the pre-existing dragnet clause included indebtedness.

This is a case of first impression in Wyoming, and there is a paucity of authority where the conflict has arisen between creditors and not between the creditor and debtor. Additionally, this case, involving

airplanes, invokes federal law in the preemptive filing requirement of federal statute, 49 U.S.C.App. § 1403, and state law priority effect under the Uniform Commercial Code.[1]

## I. FACTS

On August 7, 1981, Richard and Verlene M. Walker borrowed approximately $93,000 from First Interstate Bank of Riverton, N.A., Wyoming (First Interstate Bank). Their promissory note was secured by "Rigs." Renewed a second time on July 27, 1982, the Walkers then owed First Interstate Bank $77,000, as secured by "2 drilling rigs." On April 6, 1984, the Walkers again approached First Interstate Bank for a loan of $7,328, which was provided based upon security agreement encumbrance of the Walkers' airplane. That security agreement contained a dragnet clause, which the Walkers initialed separately, providing:

> "In addition to the Note, this security agreement secures all amounts I owe to the Bank, whether now or later. This means that every loan I have now or get later is secured by this security agreement, as well as any other amount I may owe to Bank (such as an overdraft on my checking account)."

Conforming to federal law, 49 U.S.C. App. § 1403, which requires the recording of all conveyances affecting titles to aircraft with the Federal Aviation Administration (FAA) in Oklahoma City, Oklahoma, First Interstate Bank filed the security agreement on May 9, 1984.

On August 17, 1984, the Walkers contacted First National Bank of Cortez, Colorado (First National Bank), for a $58,836 loan, and offered their plane as collateral on a second lien to the prior $7,328 encumbrance. Relying on a title search of FAA records, which revealed only that dollar amount of prior encumbrance, First National Bank advanced the money, secured by the Cessna airplane collateral. This encumbrance document was filed with the FAA on September 12, 1984. Walkers next executed a supplementary security agreement in favor of First Interstate Bank in September, 1984, recorded in October, 1984, re-securing the August 7, 1981 note and expressly including the airplane as security. In more recent foreclosure activity, First Interstate Bank sold the airplane and retained all proceeds, and the trial court determined that the dragnet clause in the initial airplane security agreement secured not only the $7,328 loan but accorded additional security for the earlier $93,000 obligation as against the later First National Bank $58,836 chattel security claim. A classic case of this kind of dragnet clause application is consequently presented, involving a prior indebtedness not directly referenced in document detail, and a later lender relying on the same security for loan collateral.

The clause used by First Interstate Bank was all-inclusive: "all amounts I owe to the bank, whether now or later." The provisions invoke principles relating to after-acquired indebtedness as well as to previously existing debts. The philosophic difference is that the secured party can, in loan document, accurately enumerate any asserted existent indebtedness coverage at instrument execution date, to be contrasted with later incurred indebtednesses as, for example, overdrafts. Additionally, the UCC as enacted in Wyoming expressly provides for a future-advance clause in chattel mortgages:

> "(e) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to

---

1. Law journal consideration of the dragnet-anaconda application is particularly directed to the subject of future advances. Note, *Future Financing Advances under the Uniform Commercial Code: Curbing the Abuses of the Dragnet Clause,* 34 U.Pitt.L.Rev. 691 (1973); Blackburn, *Mortgages to Secure Future Advances,* 21 Mo.L. Rev. 209 (1956); Note, *Enforceability of "Dragnet Clauses" in Deeds of Trust: The Current State of the Law in Texas,* 56 Texas L.Rev. 733 (1978); Note, *Future Advance Clauses in Tennessee Construction and Effect,* 5 Mem.St.U.L.Rev. 586 (1975); Note, *Mortgages Securing Future Advances—A Need for Legislation,* 47 Iowa L.Rev. 432 (1961–62); Annotation, *Debts Included in Provisions of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)— Modern Status,* 3 A.L.R.4th 690.

commitment." Section 34–21–923(e), W.S.1977 [UCC 9–204].

For a discussion of this clause, see II Gilmore, *Security Interests in Personal Property,* Ch. 35, § 35.5 at 981 (1965).

## II. RELATION OF FEDERAL AND STATE LAW

The United States Congress and succeeding case law has clarified that the supremacy clause and federal statutes control the fact of recording, but the effect of recording and sufficiency of the recorded instrument remain questions to be determined under state law.

Section 503 of the FAA, 49 U.S.C.App. § 1403, establishes the recording system and provides:

"(c) Validity of conveyances or other instruments, filing. No conveyance or instrument the recording of which is provided for by section 503(a) [subsec. (a) of this section] shall be valid in respect of such aircraft, * * * against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation * * *.

"(d) Effect of recording. Each conveyance or other instrument recorded by means of or under the system provided for in subsection (a) or (b) of this section shall from the time of its filing for recordation be valid as to all persons without further or other recordation * * *."

In 1964, Congress added section 506, and 49 U.S.C.App. § 1406 now provides:

"The validity of any instrument the recording of which is provided for by section 503 of this Act * * * shall be governed by the laws of the State, District of Columbia, or territory or possession of the United States in which such instrument is delivered, * * *."

*In Matter of Gary Aircraft Corp.,* 681 F.2d 365, 368–369 (5th Cir.1982), cert denied sub. nom. *General Dynamics Corporation v. Gary Aircraft Corporation,* 462 U.S. 1131, 103 S.Ct. 3110, 77 L.Ed.2d 1366 (1983), the court provided the analysis:

"Without question, section 506 reserves some areas of regulation for the states by assigning question of 'validity' to state law. At the same time, Congress has provided that exclusive means of recordation and has preempted state laws providing filing systems for interests in aircraft. [Citations.]

\*     \*     \*     \*     \*     \*

"After considering the language of the FAA and the CAA as well as their legislative history, we conclude that the FAA does not displace state law assignment of priorities to interests in aircraft."

"* * * [E]very aircraft transfer must be evidenced by an instrument, and every such instrument must be recorded, before the rights of innocent third parties can be affected. Furthermore, because of these federal requirements, state laws permitting undocumented or unrecorded transfers are pre-empted, * * *." *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 409–410, 103 S.Ct. 2476, 2478, 76 L.Ed.2d 678 (1983).

See also *Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,* 570 F.2d 1220 (5th Cir.1978); *Northern Illinois Corp. v. Bishop Distributing Co.,* 284 F.Supp. 121 (W.D.Mich.1968).

## III. VALIDITY OF FILING—REASON AND EFFECT

With priority of filing determinable under the federal statute, we then turn to the validity of filing as determined under the UCC and state law. The purpose of chattel security filing statutes is to provide notice, and any interpretative analysis should accord with that purpose. Lee, *Protections and Priorities Under the Uniform Commercial Code,* 17 Wyo.L.J. 1 (1962); Rudolph, *Secured Transactions Under the Commercial Code,* 14 Wyo.L.J. 220 (1960). It is noteworthy that neither author discussed the anaconda or dragnet relationship of filed instruments to pre-existing debts. See *First National Bank of Rock Springs v. Ludvigsen,* 8 Wyo. 230, 56 P. 994, reh. denied 8 Wyo. 230, 57 P. 934 (1899). The business purpose inculcated in filing statutes is to permit continued busi-

ness transactions with ascertainable knowledge of risk factors involved. If notice perfection is not provided, that commercial protection is denied and security lending risk analysis rendered unjustifiably indeterminate. We apply an interpretative analysis that advances legislative purpose, while recognizing that the text should be interpreted as written. Aldisert, *The Judicial Process*, § 4 at 170 (1976).

The notice-of-encumbrance problem is amplified in airplane cases, since access to filed documents located in Oklahoma City, Oklahoma, to examine the actual instrument is denied as could be possible by a quick trip to the local court clerk's office where other security documents are locally filed.

Unfortunately, this record does not demonstrate what would be found if physical examination of the records at the FAA facility had been made since the court's declaratory judgment decision was rendered on a stipulated factual record consisting of copies of a few instruments. That record only demonstrates DOT–FAA form 8050–41(7–83) as filing acknowledgement, and that the pledge agreement security instrument document was "returned for your records, not needed for FAA files." Consequently, the record does not portray what could be determined by any physical examination at the filing depository.[2]

In this case, the dragnet characteristic of the first filed count is not shown in dollar obligation. The result is that the document is uncommunicative to a later examining party for anything except as to the name of the encumbrancer and the one stated obligation. Consequently, other verification would be required to assure loanability as based on security status of unstated amounts with a contended priority.

■ In answering this dilemma, it was argued that the lender must call the other lender for confirmation and analysis of security document status. Practical recognition of proof-risk factors implicit to both the maker and recipient of such telephone calls justifiably rejects legislative contemplation of this assumptive responsibility within the filing statutes. It is our conclusion that if the legislature wants to afford this responsibility to subsequent lenders or buyers, the directive must be more specifically stated in statute than is presently found. See Lee, supra at 11.

An easy alternative is available to the initial lender by inclusion of notation on security agreement or financing statement, in the line for amount secured, that also demonstrates inclusion of prior indebtednesses of whatever amount or anticipates

2. What is to be seen from the stipulated record is contained in a form completed as an examination certificate of records by Federal Aviation Title Company dated November 23, 1984 which details for the involved airplane:

"(1) Ownership Registration Certificate:
"Name   Walker, Richard L. DBA R & R Drilling Co.
                          Date Issued      7–19–79
"Address   1018 East Lincoln
            Riverton Wyoming 82501
                          Date Approved   7–19–79
"Type of Ownership   Individual

* * * * *

"(2) Liens and Encumbrances—Type: SECURITY
                                    AGREEMENT
"From   Richard Walker & Verlene M. Walker
            DBA R & R Drilling
"To      First Interstate Bank of Riverton, N.A.
"Assignment Date _____
"Holder   First Interstate Bank of Riverton, N.A.
                          Date 4–06–84

"Address   P.O. Box 233            Filed 4–23–84
            Riverton, Wyoming 82501    Recorded 5–08–84
"Original Amount   $ 7,328.35
                          Document Number H41379

"ADDITIONAL INFORMATION
"SECURITY AGREEMENT
"FROM:   Richard L. Walker DBA R & R Drilling Co.
"TO:   First National Bank, Cortez, P.O. Drawer A,
                                    Cortez, CO 81321
"AMOUNT:   $58,836.73
"DATED:   8–07–84            FILED:   8–17–84
                          RECORDED:   9–14–84
                          DOCUMENT:   #J30461

"SUPPLEMENTAL SECURITY AGREEMENT
"FROM:   Richard Walker & Verlene M. Walker
            DBA R & R Drilling Co.
"TO:   First Interstate Bank of Riverton, N.A.
"AMOUNT:   $77,605.53
"DATED:   9–04–84            FILED:   9–13–84
                          RECORDED:   10–05–84
                          DOCUMENT:   #A185:

future advances for a stated maximum. Likewise, a bold-faced addition to the normal printed forms could accommodate the same information in a fashion to state the dollar amount, so that examiners in Oklahoma City or indexing clerks in the local filing repository would recognize the total amount of security claimed.

## IV. CHARACTER—CHARACTERISTICS OF DRAGNET–ANACONDA CLAUSES

As diverse factual categories, these security cases present six separate factual relationships which to some degree determine alternatively the results achieved, in differentiation of future advances from pre-existing obligation, real estate from chattel security, and two-party from third-party issues which, in the latter case, raise notice and filing attributes. See differentiation noted, *First Nat. Bank in Dallas v. Rozelle*, 493 F.2d 1196, 1202, n. 3 (10th Cir.1974); *Safe Deposit Bank & Trust Co. v. Berman*, 393 F.2d 401 (1st Cir.1968). Additionally, mutations or differing circumstances of jointly owned property and third-party acquired indebtednesses add separate complexities. A somewhat different classification of the cases is found in Annotation, *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause) —Modern Status*, 3 A.L.R.4th 690, 695. See *Wilson v. Ripley County Bank*, Ind. App., 462 N.E.2d 263 (1984); *Farmers*

*Trust and Sav. Bank v. Manning*, Ia., 311 N.W.2d 285 (1981); *Bank of Woodson v. Hibbitts*, Tex.App., 626 S.W.2d 133 (1981)[3].

## V. PRE–EXISTING DEBT—SUBSEQUENT SECURITY CLAIMANT

Our decision will be confined to the factual structure presented of dragnet application to pre-existing debts invoking chattel security with an intervening subsequent, properly filed, security-interest claimant. The second lender had no actual notice of the pre-existing debt security claim of the prior lender, either by enumeration in security documents, or otherwise.

The general principle is effectively articulated in *National Bank of Eastern Ark. v. Blankenship*, Ark., 177 F.Supp. 667, 673 (1959), aff'd sub. nom. *National Bank of Eastern Ark. v. General Mills, Inc.*, 283 F.2d 574 (8th Cir.1960):

"While a provision in a mortgage that it shall be security for indebtedness other than the primary obligation described therein is valid, a reading of the Arkansas cases indicates that such provisions are not favorites of equity, and that they will be construed rather strictly. In this connection, in *Berger v. Fuller*, 180 Ark. 372, 377, 21 S.W.2d 419, 421 [1929], the Court said: 'Mortgages of this character have been denominated "anaconda mortgages" and are well named thus, as by their broad and general terms they en-

---

**3.** The most comprehensively litigated issue involving dragnet-anaconda is found for future advances as raising inquiry of similar or dissimilar transaction rules. Among the frequently cited cases which denominate the denial rule for dissimilar transaction are *Freese Leasing, Inc. v. Union Trust & Sav. Bank, Stanwood, Ia.*, 253 N.W.2d 921, 3 A.L.R.4th 681 (1977); *Emporia State Bank & Trust Co. v. Mounkes*, 214 Kan. 178, 519 P.2d 618 (1974); and *John Miller Supply Co., Inc. v. Western State Bank*, 55 Wis.2d 385, 199 N.W.2d 161 (1972). See also *Marine Nat. Bank v. Airco, Inc.*, 389 F.Supp. 231 (W.D. Pa.1975). ILlustrative cases include, *National Acceptance Co. of America v. Blackford*, 408 F.2d 20 (5th Cir.1969); *Beavers v. Le Sueur*, 188 Ga. 393, 3 S.E.2d 667 (1939); *Akamine and Sons, Ltd. v. American Sec. Bank*, 50 Hawaii 304, 440 P.2d 262 (1968); *Matter of Estate of Simpson*, Ia., 403 N.W.2d 791 (1987); *Canal Nat. Bank v. Becker*, Me., 431 A.2d 71 (1981); *Second*

*Nat. Bank of Warren v. Boyle*, 155 Ohio St. 482, 99 N.E.2d 474 (1951); *Community Bank v. Jones*, 278 Or. 647, 566 P.2d 470 (1977); *First Sec. Bank of Utah v. Shiew*, Utah, 609 P.2d 952 (1980); *In re Grizaffi*, 23 B.R. 137 (Bkrtcy.D. Colo.1982).

Cases in future advance category stating a somewhat different rule with not necessarily similar results are essentially definable in clear-intent application and include *Uransky v. First Federal Sav. & Loan Ass'n of Fort Myers*, 684 F.2d 750 (11th Cir.1982); *In re Riss Tanning Corp.*, 468 F.2d 1211 (2d Cir.1972); *Kenneally v. Standard Electronics Corp.*, 364 F.2d 642 (8th Cir.1966); *Ex Parte Chandler*, Ala., 477 So.2d 360 (1985); *First Nat. Bank of Guntersville v. Bain*, 237 Ala. 580, 188 So. 64 (1939); *Mohler v. Buena Vista Bank and Trust Co.*, 42 Colo.App. 4, 588 P.2d 894 (1978); *State Bank of Albany v. Fioravanti*, 51 N.Y.2d 638, 438 N.Y.S.2d 947, 417 N.E.2d 60 (1980); *Bloom v. First Vermont Bank & Trust Co.*, 133 Vt. 407, 340 A.2d 78 (1975).

wrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate, and to extend them further than has already been done would, in our opinion, be dangerous and unwise * * *.' "The 'other indebtedness' secured by a mortgage may be either antecedent or subsequent. Where it is antecedent, it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred. * * *

\* \* \* \* \* \*

"* * * Where a mortgage is given to secure a specific debt named, the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms, and, to be extended to cover debts subsequently incurred, these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. * * *

\* \* \* \* \* \*

"* * * 'A debt created subsequent to the mortgage, being not yet in existence, may not in all cases be clearly indicated; whereas, antecedent debts may always be definitely stated, and for this reason the general expression, "other indebtedness," would usually be treated as referring not to an antecedent debt but to one subsequently incurred.' " Quoting from *Hendrickson v. Farmers' Bank & Trust Co.,* 189 Ark. 423, 73 S.W.2d 725 (1934).

See also the discussion in that case as restated on appeal, *National Bank of*

*Eastern Ark. v. General Mills, Inc.,* supra.[4]

It is apparent that acquired indebtednesses as attempted to be enfolded into the anaconda provision in security priority has received adverse attention, whether justified in absence of intent of the parties or a different transaction consideration equally applied to antecedent and future-advance cases. *Berger v. Fuller,* 180 Ark. 372, 21 S.W.2d 419 (1929), purchased pre-existing indebtedness; *Thorp Sales Corp. v. Dolese Bros. Co.,* 453 F.Supp. 196 (W.D.Okla. 1978), quoting from *National Bank of Eastern Ark. v. Blankenship,* supra:

" 'The "other indebtedness" secured by a mortgage may be either antecedent or subsequent. Where it is antecedent, it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred.' " *Thorp Sales Corp. v. Dolese Bros. Co., supra, 453 F.Supp. at 200.*[5]

These principles afford a result in general application of the judicial attitude frequently stated to require careful scrutiny and strict construction as factually disproving concealment, haste, or artifice. *Gates v. Crocker–Anglo Nat. Bank,* 257 Cal.App. 2d 857, 65 Cal.Rptr. 536 (1968). See also *First v. Byrne,* 238 Ia. 712, 28 N.W.2d 509, 172 A.L.R. 1072 (1947). *Marine Nat. Bank v. Airco, Inc.,* 389 F.Supp. 231 (W.D.Pa. 1975); *Wong v. Beneficial Sav. and Loan Ass'n.,* 56 Cal.App.3d 286, 128 Cal.Rptr. 338 (1976). In pre-code and Art. 9 consideration, see II Gilmore, supra, at 916.

Following the leadership of the Blankenship cases, this category of anaconda cases

---

**4.** Although not relevant now on the declaratory-judgment record, we would not necessarily afford priority to subsequent acquirers of interest if actual knowledge of the claimed dragnet debt security application did exist. See *Dixie Ag Supply, Inc. v. Nelson,* Ala., 500 So.2d 1036 (1986).

**5.** Joint owners and collaterally involved parties invoke a similar negative construction under the purview of general principles of strict construction. *Gates v. Crocker–Anglo Nat. Bank,* 257 Cal.App.2d 857, 65 Cal.Rptr. 536 (1968);

*Mohler v. Buena Vista Bank & Trust Co.,* supra, 588 P.2d 894 at n. 3; *National Acceptance Co. of America v. Exchange Nat. Bank of Chicago,* 101 Ill.App.2d 396, 243 N.E.2d 264 (1968); *Farmers Trust and Sav. Bank v. Manning,* supra, 311 N.W.2d 285; *In re Peterson,* 27 B.R. 95 (Bkrtcy. M.D.Fla.1983). Likewise, tort claims are not normally dragnetted to security priority. *Trapp For Use and Benefit of First Mississippi Bank of Commerce v. Tidwell,* Miss., 418 So.2d 786 (1982).

was reconsidered in the third principal case of *Sowder v. Lawrence*, 129 Kan. 135, 281 P. 921, 922–923 (1929):

> "* * * The policy of the law with reference to the Recording Act is to thereby afford notice to the world as to the maximum amount of indebtedness against the property therein described. If a general clause of the kind and character found in this mortgage will afford a lien on the property for any and all private and secret obligations between the parties at the time of the execution of the mortgage, other creditors and subsequent purchasers would have no protection whatever.
>
> " 'A mortgage securing a debt of a fixed amount cannot be extended so as to become a lien for another and different indebtedness not expressed.' Jones on Chattel Mortgages, § 91."

"The trust deeds on their face show that no antecedent indebtedness is specifically described. Thus the court was justified in finding that no antecedent debt was secured by the trust deeds, and that no intent was expressed that the other indebtedness clause was intended to secure debts primarily secured by the separate trust deeds." *National Bank of Eastern Ark. v. General Mills, Inc.*, supra, 283 F.2d at 578.

Although in a case involving a future-advance question, the same principle was refined by the Hawaiian court in *Akamine and Sons, Ltd. v. American Sec. Bank*, 50 Hawaii 304, 440 P.2d 262, 268 (1968):

> "* * * Unless the prior or subsequent advance relates to the same transaction or series of transactions, the mortgage must specifically refer to it for the advance to be secured. This court will not assist a lending institution in an attempt to captivate a borrower by inclusion in a mortgage of a broad all inclusive dragnet clause."

Similarly reasoned, although it also included the different-person indebtedness question, in *First v. Byrne*, supra, 28 N.W.2d at 512, the court determined:

> "* * * We are left to assume the mortgage form was used without discussion of the particular clause in question and with no special regard having been given to its consequences—certainly with no express common intent or purpose as to the debt in question.
>
> "No reason is suggested why this debt was not referred to in the mortgage if it was intended to be included. It would seem good faith required some mention of it."

In *United States v. Fahrenkamp*, 312 F.2d 627, 630 (8th Cir.1963), the federal court again followed the principles by citation of the Arkansas case:

> " 'Where a mortgage is given to secure a specific debt named, the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms, and, to be extended to cover debts subsequently incurred, these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. The reason is that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate.' *Hendrickson v. Farmers Bank & Trust Company*, 189 Ark. 423, 434, 73 S.W.2d 725, 729 (1934)."

See *Archer–Daniels–Midland Co. v. North Arkansas Milling Co.*, 205 F.Supp. 524 (W.D.Ark.1961). See also Oklahoma's adoption of the specific-identification rule. *First Nat. Bank of Ardmore v. Gillam*, 134 Okl. 237, 273 P. 261 (1927); *Farmers Nat. Bank of Cherokee v. De Fever*, 177 Okl. 561, 61 P.2d 245, 247 (1936):

> "* * * [A] chattel mortgage, executed on a printed form in which was inserted, in one of several blank spaces provided therein for the insertion of a description of the obligations to be secured, a specific description, including the amount, of a note executed at the same time, did not secure, by force of a further printed provision in the mortgage that it was to stand as security for all other indebtedness and liabilities of the mortgagor to the mortgagee, another existing note not identified in the mortgage."

The Utah court, in *First Sec. Bank of Utah v. Shiew,* Utah, 609 P.2d 952 (1980), considered a dragnet clause as "a standard boilerplate provision" inserted in the home mortgage where the purpose of the mortgage was to purchase the house, and the issue was whether that mortgage carried into security right a subsequently claimed cattle and feed loan. Although the case could be defined as lacking a scintilla of evidence posture, the court approved with extensive quotation of Osborne, Nelson, Whitman, *Real Estate Finance Law,* § 12.8, p. 773 (1979):

> " '1. The mortgage will only secure advances made or debts incurred in the future. If the mortgagor already owes debts to the mortgagee at the time the mortgage is executed, it would supposedly be easy to identify those existing debts specifically; if they are not so identified, it is assumed that the parties did not intend to secure them.' "

In a case where the security document specifically referenced both the prior indebtedness and the promissory note which evidence that debt, the Alabama court determined:

> "It is the law in Alabama, however, that a dragnet clause which, although not itemizing the existing indebtedness, does, by clear and unequivocal terms, reference and include a specific and identifiable antecedent debt, extends the coverage of the security agreement to that antecedent debt. The dragnet clause, therefore, may be given the full effect of its terms." *Dixie Ag Supply, Inc. v. Nelson,* Ala., 500 So.2d 1036, 1040 (1986).

It is apparent that the more carefully defined and refined cases recognize the difference between the validity of a dragnet transaction as a theory and a question as to the specificity or criteria required in bringing the particular indebtedness within the purview of the security document language. We would also follow that academic approach in recognizing the validity of anaconda-dragnet within its proper arena of commercial lending transactions, as a theory, and then assess a requirement of specificity, regularity, and detail.

## VI. WYOMING STATUTE

In this case, involving a third-party claimant, Wyoming laws regarding filings and notice acquire significance. Section 34–21–927, W.S.1977, Request for statement of account or list of collateral, invading the field of actual notice if a copy is furnished to the succeeding interest holder, and § 34–21–931(c), W.S.1977 (1987 Cum. Supp.), which provides:

> "The filing of a financing statement otherwise required by this article is not necessary or effective to perfect a security interest in property subject to:
>
> "(i) A statute or treaty of the United States which provides for a national or international registration or a national or international certificate of title or which specifies a place of filing different from that specified in this article for filing of the security interest;
>
> "(ii) The following statutes of this state, W.S. 31–2–101 through 31–2–105 and, except as otherwise provided in subsection (j) of this section, W.S. 31–2–501 through 31–2–508, but during any period in which collateral is inventory held for sale by a person who is in the business of selling goods of that kind, the filing provisions of this article (part 4) apply to a security interest in that collateral created by him as debtor; or
>
> "(iii) A certificate of title statute of another jurisdiction under the law of which indication of a security interest on the certificate is required as a condition of perfection (W.S. 34–21–903(b) (9–103(2))."

Residually applicable to this defined class are § 18–3–402(a)(ix), W.S.1977 (1987 Cum. Supp.), outlining the duties of the county clerk:

> "Keep in his office a general index, direct and inverted, in which he shall make correct entries of every instrument recorded or filed under appropriate headings, entering the names of the grantors and grantees in alphabetical order. He shall make correct entries in the index of every instrument required by law to be

entered therein. He shall immediately note in the appropriate index, in the proper column and opposite the entry whenever any mortgage, bond or other instrument has been released or discharged from record, whether by written release or by recording a deed of release;"

and § 18–3–104, W.S.1977, relating to copies of instruments and excerpts:

"Copies of all documents, writs, proceedings, instruments, papers and writings filed or deposited in the office of any district judge, county clerk or county treasurer and transcripts from books of record or proceedings kept by any such officers, with the seal of his office affixed, is prima facie evidence in all cases."

## VII.  CONVERSE AUTHORITY

First Interstate Bank cites two cases as converse authority: *Clovis Nat. Bank v. Harmon*, 102 N.M. 166, 692 P.2d 1315 (1984), and *Personal Jet, Inc. v. Callihan*, 624 F.2d 562 (5th Cir.1980). *Personal Jet* is inapplicable, since the successful creditor was the only claimant with security interest properly perfected on the aircraft, wherein the court determined that the conflicting claimant did not have a document "sufficient to create a security interest." Clovis National involved protection of a guarantor, and included both pre-existing and after-acquired indebtednesses in a real estate mortgage relationship. Priority was granted mathematically, based on filing-date status, and the case includes no discussion of the anaconda-dragnet inquiries. That case is essentially the only authority which could sustain a contrary result, but lacks cogent inquiry or logical persuasion.

## VIII.  CONCLUSION

We adopt the persuasive posture of the Blankenship cases requiring specification of the amounts in order for dragnet clauses to afford recording priority for pre-existing debt.

The judgment is reversed, and the case is remanded for proceedings in accord herewith.

BROWN, Chief Justice, specially concurring.

I concur in the majority opinion only to the extent that it adds a very limited requirement for perfection of a security interest in collateral for antecedent debts. This is not a case dealing with a security interest in collateral based on a future advance. Further, as the majority notes in footnote 4, these facts do not present us with a subsequent lender who had actual knowledge of antecedent debt coverage of collateral. Keeping these caveats in mind, I would restate the holding to be: Security agreement clauses covering antecedent debt will only be enforced in Wyoming when the antecedent indebtedness is clearly identified on the financing statement as a dollar amount secured.

THOMAS, Justice, dissenting, with whom CARDINE, J., joins.

I dissent from the majority disposition of this case, and I join in the keen and logical dissenting opinion of Justice Cardine. I offer a brief elaboration of the analysis of this case to sharpen the points made by Justice Cardine and to protest the impact of this case upon Wyoming law. I am constrained to wonder, as I am sure others will, "Whatever happened to the Uniform Commercial Code?"

As I understand the holding of this case, First National Bank, Cortez, Colorado (Cortez Bank), having notice of the existence of a security agreement between the Walkers and First Interstate Bank of Riverton, N.A. (Riverton Bank), is excused from any requirement that it examine the security agreement or make further inquiry. If this is not the thrust of the majority decision, then we apparently are declaring invalid any clause in a security agreement that would purport to secure antecedent indebtedness. This latter disposition surely would be unique in the law.

As Justice Cardine points out in his dissenting opinion, had the Cortez Bank examined the security agreement, as filed in the office of the County Clerk of Fremont County or in the file of the Federal Avia-

tion Administration (FAA) or as furnished by the Walkers upon request, the instrument would have disclosed, without equivocation, the intent of the Walkers and the Riverton Bank to secure antecedent debts. Additional research in the office of the County Clerk of Fremont County or further inquiry of the Walkers should have disclosed the aggregate amount of any antecedent indebtedness. The majority opinion notes correctly that the validity of the security agreement, which was filed with the FAA, is controlled by state law. Unfortunately, the majority then fails to apply the appropriate Wyoming law. Instead, the majority decision affords substantive effect to what appears to be a certificate of examination of the records of the FAA by Federal Aviation Title Company, although there is no indication in the record that the information actually was obtained by the Cortez Bank. The majority then holds that, since the certificate of examination did not allude to any antecedent debt, the Riverton Bank is limited in priority to the dollar amount that the agents of the Federal Aviation Title Company chose to set forth on the face of the certificate. This result pertains despite the fact that the Riverton Bank had done all that it possibly could to comply with the requirements of the Uniform Commercial Code (U.C.C.), as adopted in Wyoming, and with federal law, and despite the fact that the majority opinion concedes the proposition that no substantive effect flows from the requirement of federal law that the security agreement be recorded with the FAA. It almost appears that the Riverton Bank is barred from its claim to the security in this instance by what simply may have been a mistake on the part of the Federal Aviation Company, a result that is difficult to understand or accept.

Contrary to the holding of the majority, the law does not require that a security agreement recite the amount of the debt secured. See § 34–21–922, W.S.1977 (1987 Cum.Supp.) (U.C.C. § 9–203); *Clovis National Bank v. Harmon*, 102 N.M. 166, 692 P.2d 1315 (1984); 8 R. Anderson, Uniform Commercial Code § 9–203:27 at 676 (1985). The statutes contain minimal requirements with respect to the enforceability and the attachment of a security interest. If the collateral is not in the possession of the secured party, it is necessary that the debtor have signed a written security agreement that contains a description of the collateral and manifests the intention of the parties to create a security interest in that collateral. *WYHY Federal Credit Union v. Burchell*, Wyo., 643 P.2d 471 (1982); 8 Anderson, supra, § 9–203:17 at 669–670. If value has been given, and the debtor has rights in the collateral, the security interest attaches and becomes enforceable against the debtor with respect to the collateral as soon as all of the minimal requirements have been met. Section 34–21–922, W.S.1977 (1987 Cum.Supp.); Uniform Commercial Code (U.L.A.) § 9–203, Comment 1, 1972 Official Comment. Value as defined by § 34–21–120(a)(xliv) and (B), W.S.1977, includes total or partial satisfaction of a pre-existing claim.

The security agreement between the Riverton Bank and the Walkers met the requirement for giving of value, and it provided that all amounts owed to the bank, whether then existing or later advanced, were covered. The Cessna aircraft was described as the collateral. Section 34–21–120(a)(iii), W.S.1977, contains a definition of agreement, which provides that the bargain of the parties may be found in the language used or by implication from other circumstances. At the time the security agreement was executed, the Walkers owed the Riverton Bank $93,000 on a promissory note that was made on August 7, 1981. It is clear that the parties intended the aircraft as collateral to secure the pre-existing debt. See *Clovis National Bank v. Harmon*, supra. Since the Walkers had rights in the collateral (the Cessna), and the agreement did not provide otherwise, the security interest of the Riverton Bank attached when the Walkers signed the security agreement of April 6, 1984. That security interest was perfected, according to law, on April 23, 1984, when the Riverton Bank filed the security agreement with the FAA. See *Bank of Oklahoma, City Plaza v. Martin*, Okl.App., 744 P.2d 218 (1987); *In*

*re Gelking,* 754 F.2d 778 (8th Cir.1985). Subsequently, the Cortez Bank perfected its security interest in the same Cessna by filing with the FAA, but the interest of the Riverton Bank was superior to that of the Cortez Bank, at least according to § 34–21–941(e)(i), W.S.1977 (1987 Cum. Supp.). Although the Cortez Bank alleged otherwise in its pleadings, the only amounts claimed by the Riverton Bank relate to the existing indebtedness plus the new promissory note made when the Walkers signed the April 6, 1984 security agreement; no issue is present with respect to any priority that the Cortez Bank might have over a supplemental security agreement, which was signed by the Walkers on September 4, 1984, and recorded with the FAA on October 5, 1984, after the perfection of the security interest of the Cortez Bank.

The express concern of the majority with respect to lack of notice to the Cortez Bank, because of its conclusion that the FAA records do not contain sufficient information to advise subsequent creditors that an aircraft may be collateral for preexisting debts, is not a material consideration. It is not clear from this record what information may be obtained from the files of the FAA. The record does establish that the Riverton Bank filed the April 6, 1984 security agreement with the FAA, and it was returned by the FAA stamped:

"RETURNED FOR YOUR RECORDS NOT NEEDED FOR FAA FILES."

The record also encompasses a document, addressed to the Riverton Bank, which is entitled "EXAMINATION CERTIFICATE OF RECORDS," prepared by the Federal Aviation Title Company and certifying information found in the records that it examined. It appears that the majority assumes that the only information contained in the FAA files is that reflected in the examination certificate and that, had the Cortez Bank examined the FAA records, it justifiably would have reached the conclusion that the Riverton Bank's security interest in the Cessna was limited to the amount advanced at the time the April 6, 1984 security agreement was signed. Even if one were to accept those assumptions, the concern with respect to the sufficiency of information in the FAA file to provide appropriate notice to subsequent creditors is not well founded. Filing with the FAA furnishes notice, and the opportunity to obtain the appropriate information is available to subsequent creditors in other ways.

A federal filing system with respect to conveyances of aircraft was adopted for the purpose of providing a central source of information from which notice of transactions could be obtained through an indexing system. See *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). The function of the system is very similar to the notice provided through local filing systems for secured transactions. See *In re Gelking,* supra; *Bank of Oklahoma, City Plaza v. Martin,* supra; Uniform Commercial Code (U.L.A.) § 9–302, Comment 8, 1975 Official Comment. In this instance, the information that is found in the "EXAMINATION CERTIFICATE OF RECORDS" is exactly the same as that which should be included in a financing statement. If the Cortez Bank had examined the FAA record, it would have known of the prior security interest in the Cessna in favor of the Riverton Bank, and it then would have had the opportunity to obtain all appropriate information.

This court, in a number of instances, has recognized the difference between a financing statement and a security agreement and the requirements and functions of a financing statement. See, e.g., *Landen v. Production Credit Association of Midlands,* Wyo., 737 P.2d 1325 (1987); *Sannerud v. First National Bank of Sheridan,* Wyo., 708 P.2d 1236 (1985); *Daly v. Shrimplin,* Wyo., 610 P.2d 397 (1980); *American National Bank of Riverton v. First National Bank of Lander,* Wyo., 446 P.2d 968 (1968). In *Daly v. Shrimplin,* supra, the court pointed out that a financing statement is filled to give constructive notice of a security interest in property. We noted that § 34–21–951, W.S.1977, encompasses the formal requisites of financing statements, and we quoted the following with approval:

" ' * * * The purpose of the filed statement or agreement is to give the minimum information necessary to put a searcher on inquiry. The section contemplates that the complete state of affairs will be learned only after such inquiry. * * * ' *Bank of North America v. Bank of Nutley,* 94 N.J.Super. 220, 227 A.2d 535, 539 (1967)." *Daly v. Shrimplin,* supra, 610 P.2d at 404.

In *Landen v. Production Credit Association of Midlands,* supra, we quoted the provisions of § 34–21–951(a), W.S.1977, which do not require that the amount of indebtedness be stated, but do require "an address of the secured party from which information concerning the security interest may be obtained * * *." All of that was present in this instance.

The decisions of this court heretofore have been entirely consistent with the application of the U.C.C. as understood by the drafters, and respected authorities in this area of the law. Uniform Commercial Code (U.L.A.) § 9–402, Comment 2, 1981 Official Comment, from which § 34–21–951, W.S.1977, was drawn, says, in pertinent part:

"This section adopts the system of 'notice filing' which proved successful under the Uniform Trust Receipts Act. What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. Section 9–208 provides a statutory procedure under which the secured party, at the debtor's request, may be required to make disclosure. Notice filing has proved to be of great use in financing transactions involving inventory, accounts and chattel paper, since it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement where the collateral changes from day to day. Where other types of collateral are involved, the alternative procedure of filing a signed copy of the security agreement may prove to be the simplest solution. Sometimes more than one copy of a financing statement or of a security agreement used as a financing statement is needed for filing. In such a case the section permits use of a carbon copy or photographic copy of the paper, including signatures. "However, even in the case of filings that do not necessarily involve a series of transactions the financing statement is effective to encompass transactions under a security agreement not in existence and not contemplated at the time the notice was filed, if the description of collateral in the financing statement is broad enough to encompass them. Similarly, the financing statement is valid to cover after-acquired property and future advances under security agreements whether or not mentioned in the financing statement."

In his work on the U.C.C., Anderson says:

"When a proper filing is made, third persons are presumed to have notice of and are subject to the provisions of the security agreement. A person is charged with possessing the information that could have been discovered had he made the inquiry suggested by the filing." 9 R. Anderson, Uniform Commercial Code, § 9–402:6 at 448 (3d ed. 1985). (Footnotes omitted.)

Later, Anderson says:

"The financing statement only gives notice that a security interest is claimed in certain described collateral. There is no requirement that the financing statement identify the obligation that is secured by the secured transaction nor to state the terms of such obligation. As there is no requirement that the financing statement identify the debt, there is no requirement that the financing statement set forth the amount of the debt, that future advances may be made, or the maximum amount of the debt.

"Because the financing statement does not identify any particular debt as underlying the secured transaction, the one

financing statement may cover many successive obligations of the debtor with respect to the described collateral, without regard to the fact that different obligations are involved, or that there has been a refinancing of the obligation underlying the original secured transaction. Thus one filing of a financing statement may cover all secured transactions between the debtor and creditor and there is no requirement that a new financing statement be filed every time that a later secured transaction is entered into." 9 R. Anderson, Uniform Commercial Code, supra, § 9–402:22 at 462. (Footnotes omitted.)

The function of the requirement that aircraft conveyances be filed with the FAA essentially is to provide notice similar to the notice provided by a financing statement. Had the Cortez Bank done what the U.C.C. contemplates, as it has been interpreted, and pursued inquiry through the Walkers in order to obtain copies of the security agreements or looked for filed security agreements in the office of the County Clerk of Fremont County, or if any existing microfilm copy of the security agreement at the FAA had been examined, the instrument clearly would have disclosed the intent of the Walkers and the Riverton Bank to secure antecedent debts. I perceive this to be the requirement imposed upon a competing creditor by virtue of Wyoming's version of the U.C.C. "The law is almost elementary that whatever puts a party on inquiry amounts to 'notice.'" *Rodin v. State ex rel. City of Cheyenne,* Wyo., 417 P.d 180, 195 (1966).

There is no necessity to provide more protection to subsequent creditors than the legislature did in adopting the U.C.C. Yet the majority opinion extends additional protection contrary to the intention of the drafters of the U.C.C. that the duty of inquiry assigned to a subsequent creditor does not end with an investigation of the financing statement or even the security agreement. See *Western State Bank v. Grumman Credit Corporation,* 564 F.Supp. 9 (D.Mont.1982). Section 34–21–927, W.S.1977 (1987 Cum.Supp.), adopted from § 9–208 of the U.C.C., sets forth the

opportunity, provided by the legislature, for a debtor to obtain verification of the amount owed and the extent of the collateral. Other cases which have been decided under the U.C.C. and the Official Comments to § 9–208 of the U.C.C. demonstrate that subsequent creditors must utilize this avenue as well. Uniform Commercial Code (U.L.A.) § 9–208, Comment 2, 1981 Official Comment states, in pertinent part:

"The financing statement required to be filed under this Article (see Section 9–402) may disclose only that a secured party may have a security interest in specified types of collateral owned by the debtor. Unless a copy of the security agreement itself is filed as the financing statement third parties are told neither the amount of the obligation secured nor which particular assets are covered. Since subsequent creditors and purchasers may legitimately need more detailed information, it is necessary to provide a procedure under which the secured party will be required to make disclosure. On the other hand, the secured party should not be under a duty to disclose details of business operations to any casual inquirer or competitor who asks for them. This Section gives the right to demand disclosure only to the debtor, who will typically request a statement in connection with negotiations with subsequent creditors and purchasers, or for the purpose of establishing his credit standing and proving which of his assets are free of the security interest. The secured party is further protected against onerous requests by the provisions that he need furnish a statement of collateral only when his own records identify the collateral and that if he claims all of a particular type of collateral owned by the debtor he is not required to approve an itemized list."

Also see 8 R. Anderson, supra, § 9–208:7 at 20; 8 W. Hawkland, Uniform Commercial Code § 9–208:01 at 567 (1986) ("Section 9–208, the mechanism chosen by the drafters of the Code for enabling interested parties to determine the existence and scope of any

security interest, reflects a compromise between the legitimate needs of potential creditors and purchasers, the privacy rights of the debtor, and the legitimate commercial need of secured parties to be free from unwarranted inquiries." (Footnote omitted.))

I am in complete accord with Justice Cardine's conclusion that a rule basically aimed at identifying the intent of parties to security agreements now is extended to benefit a competing creditor. With a minimum of diligence, the competing creditor could have discovered either that it was being misled by its borrowers or what the facts were if the borrowers did not understand them. The effect of the majority decision has to be that Wyoming lending institutions will be reluctant now to assist their existing debtors by increasing the amount of borrowing. They cannot rely upon a security agreement to give them priority with respect to antecedent indebtedness, and they may choose not to assume the burden of evaluating the file for intervening liens. I suggest that ultimately the citizens of Wyoming are going to suffer a detriment so that the First National Bank of Cortez, Colorado may have an advantage in this case.

Finally, I note that a legislative enactment, which provided that:

"(b) Underlying purposes and policies of this act [U.C.C.] are:

"(i) To simplify, clarify and modernize the law governing commercial transactions;

"(ii) To permit the continued expansion of commercial practices through custom usage and agreement of the parties;

"(iii) To make uniform the law among the various jurisdictions." (Section 34–21–102(b), W.S.1977),

now is given a construction antithetical to that stated purpose. A law that was assumed to provide certainty now is afflicted with the uncertainty created by this court's interpretation. In this instance, that result is neither necessary, appropriate nor fair.

I would affirm the judgment of the trial court in this case.

CARDINE, Justice, dissenting.

I dissent.

By promissory note dated August 7, 1981, Richard Walker and Verleen Walker borrowed from the First Interstate Bank of Riverton (FIBR) the sum of $77,605.63. By promissory note dated April 6, 1984, Richard Walker and Verleen Walker borrowed from FIBR the additional sum of $7,328.35, securing said loan with a security and pledge agreement upon a 1979 Cessna airplane. The security and pledge agreement, in addition to securing repayment of the contemporaneous loan, also secured repayment of all existing and future debts owed the bank by the following clause in the security agreement:

"(Check and initial if applicable X /s RW VW.) In addition to the Note, this security agreement secures all amounts I owe to the Bank, whether now or later. This means that every loan I have now or get later is secured by this security agreement, as well as any other amount I may owe to Bank (such as an overdraft on my checking account)."

As indicated, the box was checked with an "x," and the initials "RW" and "VW" were signed in the blank space following. The security and pledge agreement was properly filed with the county clerk in Fremont County and with the Federal Aviation Administration on the 9th day of May, 1984. On the 17th day of August, 1984, First National Bank, Cortez, Colorado, loaned Richard Walker and Verleen Walker the sum of $58,836.73, taking a security agreement in the same airplane and properly filing and recording on the 14th day of September, 1984, that security agreement with the Federal Aviation Administration. The airplane has been repossessed and sold. It is agreed that each party has properly recorded its mortgage and that FIBR is first in time and first recorded. The sole question presented is whether the prior recorded mortgage of FIBR securing all debts owed the bank secures the prior existing debt of August 7, 1981, in the amount of $77,605.63.

The cases cited in the majority opinion are between a creditor and a borrowing

debtor who claims that the parties did not intend that the security instrument be security for past existing debts. In those cases the general rule is that the intent of the parties control, and that is true whatever the form or designation of the instrument might be. *Wyoming Discount Corp. v. Lamar*, Wyo., 444 P.2d 620 (1968). If the intent of the parties was to provide security for past debts, the security instrument is held valid as providing such security. Thus it is said:

"The guiding principle in the construction of a 'dragnet' clause in a mortgage is the determination of the intention of the parties. The question frequently resolves itself into whether, in view of the surrounding circumstances and the language employed in the mortgage, the parties intended the security of the mortgage to operate upon a pre-existing or subsequently created indebtedness not specifically described in the mortgage. *Monroe County Bank v. Qualls* (1929) 220 Ala. 499, 125 So. 615." Annot., Debts included in provision of mortgage purporting to cover unspecified future or existing debts ("dragnet" clause), 172 A.L.R. 1079, 1080 (1948). See also 55 Am.Jur.2d Mortgages §§ 137 and 142 (1971).

In this case there can be no question but that the parties to the security agreement, FIBR and the Walkers, intended that the security and pledge agreement secure the $7,328.35 being loaned and all amounts owed the bank at that time. Such intent is evidenced by the "x" marked in the box acknowledging the paragraph as applicable and initialing by the parties indicating agreement that the airplane be security for debts owed the bank. The intent of the parties is apparent on the face of the agreement and could not have been made more clear. Between the parties it is effective. An overwhelming majority of courts have upheld these clauses except where a contrary intention appears. In *Frantz v. First National Bank & Trust Co. of Wyoming*, Wyo., 687 P.2d 1159, 1162 (1984), we said:

"A security agreement is effective according to its terms between the parties and subsequent purchasers if properly perfected by filing. The subsequent purchasers are presumed to have notice and are, therefore, subject to the provisions of the agreement."

This court acknowledged the validity of a provision in a security instrument securing other indebtedness in *Lammey v. Producers Livestock Credit Corporation*, Wyo., 463 P.2d 491 (1970), wherein the mortgage agreement provided security for other indebtedness that might arise or be created, and we held that the extension of a previous note and a note given for payment by the mortgagee of taxes and assessments constituted other indebtedness secured by the mortgage agreement.

I would hold that the security and pledge agreement was effective between FIBR and the Walkers to provide a security interest in the airplane for past indebtedness because that was their intent; that the face of the security instrument clearly indicated the intent to secure a past indebtedness; that, as to third parties upon recording, the FIBR security agreement afforded a valid lien for past debts and, being first in time and first recorded, entitled FIBR to the first proceeds upon foreclosure.

I find it anomalous that the majority opinion can accept as valid a dragnet clause that secures future indebtedness but is unable to acknowledge within the same clause an agreement to secure past indebtedness. With respect to future indebtedness, § 34–21–923(c), W.S.1977 (§ 9–204(3), UCC), provides:

"(c) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment * * *."

The amount of future advances are unknown at the time the security instrument is executed. The amount of past debts owed are known. But what difference should that make? In this case, if instead of past indebtedness the debt had been a future advance, appellee would have prevailed. Appellant would have known no more about the amount of future debt

owed, would have had a second lien and received nothing on foreclosure.

"According to the generally prevailing doctrine, advances made under a recorded mortgage given to secure future optional advances will not be denied priority in lien merely because the intervening encumbrancer could not have determined from the mortgage, without extraneous inquiry, the true amount of the indebtedness of advances secured thereby." 55 Am.Jur.2d Mortgages § 352 at 411 (1971).

In either case, a second lender can only know from an examination of the security instrument that past and future indebtedness is secured and cannot know without further inquiry whether or not there exists past or future indebtedness. If there is a disadvantage, it is the same; why we should treat future indebtedness any differently than past indebtedness is difficult to understand. That is so even though past indebtedness can be ascertained.

In passing, we must note that the filing with the federal aviation agency states:

"The security conveyance dated 4/6/84 covering the above collateral was recorded by the FAA Aircraft Registry on 5/8/84 as conveyance number H41379."

Appellant could have examined FIBR's mortgage on this airplane recorded with FAA and recorded in the Fremont County Clerk's office. Had they examined that document, they would have known that it contained a clause "x"ed as applicable and initialed by the Walkers agreeing that the airplane was security for past and future indebtedness. They would have known that making the loan upon this airplane might result in their having a second lien subject to a first lien of FIBR for past debts. This Colorado bank would have known that their lien would be second behind the first lien of FIBR. The New Mexico Supreme Court has held this to be the case. *Clovis National Bank v. Harmon*, 102 N.M. 166, 692 P.2d 1315 (1984).

The rule now adopted by this court, which invalidates the provision in a mortgage providing security for past indebtedness, stands alone among all the cases that have considered this question. That is true even of the Arkansas cases cited as authority for the majority opinion, for these cases concern only the rights between parties to the mortgage itself and do not deal with the rights of third-party lenders. *Hendrickson v. Farmers' Bank & Trust Co.*, 189 Ark. 423, 73 S.W.2d 725 (1934); *Security Bank v. First Nat. Bank*, 263 Ark. 525, 565 S.W.2d 623 (1978); *National Bank of Eastern Arkansas v. General Mills, Inc.*, 283 F.2d 574 (8th Cir.1960); Annot., Debts included in provision of mortgage purporting to cover all future and existing debts (dragnet clause)—modern status, 3 A.L. R.4th 690 (1981). The Arkansas cases give effect to the intent of the parties to the mortgage and secure past indebtedness if that intent is demonstrated by showing the amount of the past-due debt secured. I would hold the intent of the parties controlling, however demonstrated.

I would affirm the decision of the district court.